STATE EX REL. CULLEN, Appellant, v. CECI, County Judge, Respondent.*

No. 5. *Argued December 2, 1969.—Decided January 9, 1970.*
(Also reported in 173 N. W. 2d 175.)

---

* Motion for rehearing denied, without costs, on March 3, 1970.

434

436

For the appellant there were briefs by *Shellow, Shellow & Coffey* and *Robert H. Friebert,* all of Milwaukee, and oral argument by *Mr. Friebert.*

For the respondent the cause was argued by *William A. Platz* and *Mary V. Bowman,* assistant attorneys general, with whom on the brief were *Robert W. Warren,* attorney general, *Robert P. Russell,* corporation counsel of Milwaukee county, and *Gerard S. Paradowski,* assistant corporation counsel.

HEFFERNAN, J.   After perfection of the appeal in this case, but prior to the time of argument, this court decided on May 6, 1969, *State ex rel. Dore v. Stoltz* (1969), 42 Wis. 2d 534, 167 N. W. 2d 214. This case held that:

"A writ of prohibition will not be issued when there is an adequate remedy by appeal or otherwise. *See Drugsvold v. Small Claims Court* (1961), 13 Wis. 2d 228, 231, 108 N. W. 2d 648. This court has long approved the use of habeas corpus to challenge the validity of the complaint and the validity of a bindover, and we now declare that this is the sole remedy for this type of situation." (p. 538)

On the basis of this language of *Dore,* the state moved for a summary affirmance of the trial court's order denying the writ of prohibition.

The motion of the state was denied without prejudice and the parties to the appeal were directed to further brief the matter and to argue the applicability of *Dore* at the same time the appeal from the order denying the writ of prohibition was to be heard. The parties have done so.

The rule of *Dore* is perfectly clear. It holds that a writ of prohibition will not issue when there is another

adequate remedy for testing the sufficiency of a complaint and the validity of a bindover. This is, of course, not new law. It is an almost "boiler plate" capsulation of the traditional stand of this court. In the post-*Dore* case of *State ex rel. Jefferson v. Roraff* (October 3, 1969), 44 Wis. 2d 250, 170 N. W. 2d 691, the discussion of *Dore* was avoided, since this case was then pending, but *Jefferson* was based on exactly the same rationale as *Dore, i.e.,* that prohibition is an extraordinary writ that ousts a trial court of jurisdiction, and therefore it should be used only when it becomes necessary to exercise the superintending powers of this court, as distinguished from its appellate function. We pointed out that such an exigency exists only if there is no other adequate remedy available and this court's failure to act will result in extraordinary hardship. *See also In re Petition of Pierce-Arrow Motor Car Co.* (1910), 143 Wis. 282, 127 N. W. 998; *State ex rel. Fieldhack v. Gregorski* (1956), 272 Wis. 570, 76 N. W. 2d 382; *State ex rel. Joyce v. Farr* (1940), 236 Wis. 323, 295 N. W. 21; *State ex rel. Fourth Nat. Bank v. Johnson* (1899), 103 Wis. 591, 79 N. W. 1081, 51 L. R. A. 33; *State ex rel. Beaudry v. Panosian* (1967), 35 Wis. 2d 418, 151 N. W. 2d 48; *State ex rel. Kiekhaefer v. Anderson* (1958), 4 Wis. 2d 485, 90 N. W. 2d 790; *State ex rel. Ampco Metal v. O'Neill* (1956), 273 Wis. 530, 78 N. W. 2d 921; *State ex rel. Gaynon v. Krueger* (1966), 31 Wis. 2d 609, 143 N. W. 2d 437; *State ex rel. La Follette v. Circuit Court* (1967), 37 Wis. 2d 329, 155 N. W. 2d 141; *State ex rel. Schulter v. Roraff* (1968), 39 Wis. 2d 342, 159 N. W. 2d 25; *see also* James R. Cole, *Extraordinary Writs and Their Use by the Wisconsin Supreme Court to Supervise Inferior Courts,* University of Wisconsin Student Bar Journal, Vol. 3, Spring, 1969, p. 155.

*Dore* merely spelled out what has been apparent from past cases that alleged jurisdictional errors that chal-

lenge the sufficiency of a complaint or of the evidence adduced at a preliminary examination are reachable by the writ of habeas corpus and, in accordance with past precedent, prohibition is not then available. *Dore* codified the clear intendment of past cases, *i.e.*, that a defendant who contends that a complaint is legally insufficient, or the evidence adduced at a preliminary is inadequate, has the remedy of objecting to the jurisdiction of the court by petitioning for habeas corpus and by appealing to the court where such appeal lies. When such remedy exists, there is no occasion to invoke the writ of prohibition, and a court will not grant such writ.

Appellant herein does not argue that habeas corpus is not available to him nor that it would not adequately serve his purpose of exploring the sufficiency of the complaint or challenging the state's jurisdiction by way of federal preemption. Rather, he seeks to distinguish the rule of *Dore* by limiting it solely to post-bindover situations or, failing that, to have this court reconsider *Dore* and overrule it. We decline to do either. *Dore* was aimed at a patent abuse of the writ of prohibition which has resulted in a burgeoning of appeals to this court, as well as the disruption of proceedings in trial courts. The purpose of *Dore* was to make clear that prohibition would not be available here or in any other court when an adequate remedy, by habeas corpus or otherwise, was available. While *Dore* concerned a post-bindover challenge, its rationale is not limited to that situation. The vice that it is aimed at is equally pernicious where the petition for prohibition is improperly brought before bindover.

Accordingly, the rule of *Dore* is not to be limited in the manner that appellant contends. Prohibition will not lie whenever habeas corpus or other adequate remedy is available.[2]

---

[2] In passing, an apparent misunderstanding of *Dore* should be corrected. In *Dore*, we stated:

While the conclusion reached above disposes of this appeal, it does not dispose of the issues raised by the appellant which now become pertinent to any further remedies that he may seek. We therefore, since these issues have been exhaustively briefed and argued, feel obliged to discuss them.

We are satisfied that the complaint is sufficient to confer jurisdiction upon the magistrate to hold a preliminary examination.[3]

"By making a motion to dismiss before the county court, however, the petitioner waived any objection to the jurisdiction of that court." (p. 540)

In the context of *Dore* this statement of law was obviously correct (*State ex rel. Offerdahl v. State* (1962), 17 Wis. 2d 334, 116 N. W. 2d 809) where the defendant moved to dismiss on the ground that the evidence at the preliminary hearing was insufficient. In *Dore* there was also a motion to dismiss because the allegations of the complaint were insufficient to confer jurisdiction. The *Dore* holding that a motion to dismiss waived all objections to the court's jurisdiction obviously referred only to the motion to dismiss for insufficiency of the evidence. That motion invokes the jurisdiction of the court to exercise its judicial powers to examine the testimony to determine whether it is sufficient to commit a defendant for trial.

[3] The complaint reads as follows:

"Whereas, Gary Grundy, being first duly sworn on oath, states upon information which he verily believes to be true to David J. Cannon, that Michael Denis Cullen, the abovenamed defendant on the 24th day of September, A. D., 1968, in the County of Milwaukee, Wisconsin,

"(1) in company with others, did feloniously and burglariously intentionally enter a building, to-wit: the offices of Selective Service, located at 135 West Wells Street, City and County of Milwaukee, State of Wisconsin, without consent of the persons in lawful possession of said premises, and with intent to steal therein, contrary to Sections 943.10 (1) (a) and 939.05 of the statutes;

"(2) in company with others, did feloniously intentionally take and carry away property of another, without consent of the person in possession thereof, by removing keys from the apron pocket on the person of one Margaret Bauer, cleaning lady, on the premises at 135 West Wells Street, City and County of Milwaukee,

The complaint at this point need not contain all the allegations of fact which if proved would be necessary to convict. The test to be applied at this stage is the same as that which is required for the issuance of a warrant:

". . . enough information [shall] be presented to the Commissioner to enable him to make the judgment that the charges are not capricious and are sufficiently supported to justify bringing into play the further steps of the criminal process." *Jaben v. United States* (1965), 381 U. S. 214, 224, 85 Sup. Ct. 1365, 14 L. Ed. 2d 345.

We do not agree, however, with the contention of the state that a complaint issued subsequent to a valid arrest need not state probable cause. While its purpose is

State of Wisconsin, contrary to Sections 943.20 (1) (a) and (3) (d) 2 and 939.05 of the statutes; and

"(3) in company with others, did feloniously, by means of fire, intentionally damage property, to-wit: Selective Service records, the property of Selective Service, valued in excess of One Hundred Dollars, without the consent of Selective Service, contrary to Sections 943.03 and 939.05 of the statutes, and all against the peace and dignity of the State of Wisconsin, and prays that the said Michael Denis Cullen may be dealt with according to law.

"Complainant further states that his information is based upon observation of defendant, together with a group of 13 others, who locked arms after placing records which were removed from Selective Service office, at 135 West Wells Street, City and County of Milwaukee, State of Wisconsin, without consent of owners as described by Mrs. Margaret Bauer, cleaning lady on premises who stated that two priests came in, took key from her and removed records from office; further, complainant's information is based on statement of Lawrence Hartzheim, Jr., who stated he saw a group move bags of records from building, said bags being emptied and liquid then placed on papers and then lighted with a match, and then the 14 persons locking arms and singing until police arrived, and being in same position when complainant arrived; complainant further states he believes value of said records to be more than $100, in that he personally observed said material, and statement by Colonel Courtenay, director of Selective Service, who stated the value of damaged materials to be several thousand dollars."

no longer to authorize the seizure of the person of the defendant, it is the jurisdictional requirement for holding a defendant for a preliminary examination or other proceedings. The face of the complaint and any affidavits annexed thereto must recite probable cause for defendant's detention. *Pillsbury v. State* (1966), 31 Wis. 2d 87, 142 N. W. 2d 187, upon which the state relies, goes no further than the commonsense holding that there need not be the issuance of another arrest warrant when a person is already being held in custody under another charge.

*Pillsbury* makes it quite clear that the jurisdictional requisite for a preliminary hearing is the complaint not the warrant. Of course, if there is an appearance before a judge having subject matter jurisdiction to try the case, jurisdiction may be acquired by arraignment on the information even in absence of a complaint.

A complaint at this stage, as at any other, must meet the test of "probable cause." Contrary to the contention of the state, the requirement of "probable cause" did not have its genesis in *State ex rel. White v. Simpson* (1965), 28 Wis. 2d 590, 137 N. W. 2d 391. In Wisconsin law it is as old as the state's constitution, art. I, sec. 11, which is identical to the parallel provisions of the fourth amendment to the United States Constitution:

"Wis. Const., art. I, sec. 11:
"**Searches and seizures.** SECTION 11. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

In *State v. Brockman* (1939), 231 Wis. 634, 637, 283 N. W. 338, by no means an early Wisconsin case on the subject, this court said:

" 'The term probable cause has a well-defined meaning in the law, which is the existence of such facts and circumstances as would excite an honest belief in a reasonable mind, acting on all the facts and circumstances within the knowledge of the magistrate, that the charge made by the applicant for the warrant is true. . . .' "

*State ex rel. White v. Simpson* merely clarified the existing law and held that probable cause must be determined by an impartial magistrate and could not be determined by a prosecuting attorney. The *White v. Simpson* problem is not pertinent to this case.

There is no contention that the allegations reciting the statutes violated do not skeletally constitute proper charges. Rather, appellant's attack is directed to the alleged inadequacy of the portion of the complaint which purports to answer the *White v. Simpson* question (p. 594), "What makes you think that the defendant committed the offense charged?" In *White* we relied upon the *Jaben* standard for a reply to that question. The information presented to the magistrate by the complaint, affidavit, or testimony must be sufficient for him to conclude that "the charges are not capricious and are sufficiently supported to justify bringing into play the further steps of the criminal process." *Jaben, supra,* page 224.

We would not conclude, nor are we obligated at this stage to conclude, that the facts alleged in the complaint, even though proved, would be sufficient to sustain a conviction. It is enough that a fair-minded magistrate could conclude that the facts and circumstances alleged justify further criminal proceedings and that the charges are not merely capricious. Using this test, we are of the opinion that an impartial magistrate could conclude that there was probable cause to justify holding Cullen for further proceedings. Admittedly, the complaint and its underlying affidavit evince miserable draftsmanship and confusing syntax, but a fair reading of the document

makes it clear that a group of persons, of whom Cullen was one, entered into the selective service headquarters without consent, took therefrom certain draft records and burned them in a nearby park, and that Cullen, together with other members of the group, joined hands and sang while the documents were burning. We conclude that these assertions are sufficient to charge the defendant with the crimes alleged.

Appellant, however, contends that the answer to the question of *State ex rel. Evanow v. Seraphim* (1968), 40 Wis. 2d 223, 230, 161 N. W. 2d 369, "Who says so?" is inadequately answered. He objects to the complaint because it is based upon hearsay. This, of course, is not fatal if the complaint or its supporting affidavit shows the reliability of the hearsay information. *State ex rel. White v. Simpson, supra; Giordenello v. United States* (1958), 357 U. S. 480, 78 Sup. Ct. 1245, 2 L. Ed. 2d 1503; *Aguilar v. Texas* (1964), 378 U. S. 108, 84 Sup. Ct. 1509, 12 L. Ed. 2d 723; *United States v. Ventresca* (1965), 380 U. S. 102, 85 Sup. Ct. 741, 13 L. Ed. 2d 684; and *Jones v. United States* (1960), 362 U. S. 257, 80 Sup. Ct. 725, 4 L. Ed. 2d 697.

Here, of course, the person who made the complaint saw Cullen standing with others and exultantly singing as the draft records burned. He also stated that he saw the material destroyed and believed it to be of a value of more than $100. This was not hearsay. It was the direct eyewitness testimony of the affiant.

Hearsay is, however, an important underpinning of the complaint. Margaret Bauer, a cleaning lady on the premises, stated that the entry was without consent, that the keys were taken from her, and that the papers were removed from the office.

Lawrence Hartzheim, Jr., saw the records being removed from the office and ignited in the park.

Colonel Courtenay, director of the Wisconsin selective service, stated that the value of the property damaged was several thousand dollars.

We do not quarrel with appellant's assertion that Mr. Justice BYRON WHITE in the concurrence to *Spinelli v. United States* (1969), 393 U. S. 410, 89 Sup. Ct. 584, 21 L. Ed. 2d 637, properly stated the rule that hearsay relied upon in support of a complaint requires some basis for crediting its reliability whether the informants are named or not. Merely naming the informant does not satisfy that requirement, but a statement in the complaint which shows why credence should be placed in his assertion does.

A full statement of Mr. Justice WHITE'S rationale explains the validity of this position:

"Neither should the warrant issue if the officer states that there is gambling equipment in a particular apartment and that his information comes from an informant, named or unnamed, since the honesty of the informant and the basis for his report are unknown. Nor would the missing elements be completely supplied by the officer's oath that the informant has often furnished reliable information in the past. This attests to the honesty of the informant, but *Aguilar v. Texas, supra,* requires something more—did the information come from observation, or did the informant in turn receive it from another? Absent additional facts for believing the informant's report, his assertion stands no better than the oath of the officer to the same effect." (p. 424)

Here the fact is that the complaint shows that all whose information was relied upon were eyewitnesses to the portion of the event they related to the sworn complainant. If hearsay is to be credited at all for this limited purpose, what better basis can there be than that of eyewitness testimony. To use the term of Mr. Justice WHITE, the hearsay was clearly based upon "observation."

We, of course, do not agree with the statement of the state that merely naming the informant without a showing of why his information was reliable would be sufficient. The state's brief contains the amazing assertion that, "If the magistrate had had any doubts regarding the informants' credibility, their identification by name in the complaint permitted the magistrate to request further information from them." This, of course, may be factually true, but it misconceives the function of an impartial magistrate and the purpose of a complaint, at least in instances where the complaint is used as the sole source of a magistrate's information. Since there is no evidence that these hearsay informants were brought before a magistrate, we must assume they were not before him. There is no obligation on the magistrate to conduct an investigation to verify the contents of a complaint. This is the duty of the state, and if the state fails to put sufficient facts before the magistrate, the complaint must fail even though clews and leads that could provide sufficient information are revealed in the complaint.

It should also be noted that the complaint charges Cullen as a principal, not on the theory that he directly committed the crimes charged, but on the theory that he was concerned in their commission as defined in sec. 939.05, Stats. Under that statute, an accomplice or one not directly committing the crime under the circumstances permitted by that statute may be charged as a principal.

A fair reading of the complaint leads to the conclusion that the facts alleged show probable cause for further criminal procedures against Michael Cullen under the rationale of sec. 939.05, Stats., even though it could arguably be claimed that the information therein would not necessarily show probable cause that he directly committed the crimes charged. The complaint is sufficient.

An additional ground upon which appellant based his petition for writ of prohibition was that the state was without jurisdiction to prosecute the crimes charged, because the federal government had preempted the field with respect to interference with the operation of the selective service system.

Appellant's argument is founded upon the "supremacy clause" of the Constitution of the United States, art. VI, clause 2, which provides:

"This constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding."

Mr. Chief Justice MARSHALL explicated the supremacy clause in *McCulloch v. Maryland* (1819), 17 U. S. (4 Wheaton) 316, 4 L. Ed. 579, and *Gibbons v. Ogden* (1824), 22 U. S. (9 Wheaton) 1, 6 L. Ed. 23. *McCulloch,* although not a preemption case in the sense now understood, discussed the problem of dual sovereignty in our federal system. The case presented the question of whether the state of Maryland could rightly tax a Maryland branch of the Bank of the United States. In his 120 page opinion, the chief justice concluded:

"The Court has bestowed on this subject its most deliberate consideration. The result is a conviction that the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared." (p. 436)

*Gibbons v. Ogden* posed the question of the power of the state of New York to regulate the operation of fed-

erally licensed ships in coastal waters. In striking down the New York statute, Mr. Chief Justice MARSHALL said:

"The nullity of any act, inconsistent with the constitution, is produced by the declaration, that the constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties, is to such acts of the State Legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged State powers, interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution, or some treaty made under the authority of the United States. In every such case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it." 22 U. S. (9 Wheaton) 210, 211.

A leading contemporary case on federal preemption and the supremacy clause is *Pennsylvania v. Nelson* (1956), 350 U. S. 497, 76 Sup. Ct. 477, 100 L. Ed. 640. A Pennsylvania act provided criminal penalties for seditious activities directed at either the state of Pennsylvania or the United States. The Smith Act passed by Congress prohibited identical activities. Nelson was convicted under the Pennsylvania act for sedition against the government of the United States. The Pennsylvania act, insofar as it proscribed sedition against the federal government, was struck down by the state supreme court and affirmed by the United States high court with the following reasons:

"*First,* '[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Pennsylvania v. Nelson, supra,* at 502, citing *Rice v. Santa Fe Elevator Corp.* (1947), 331 U. S. 218, 230, 67 Sup. Ct. 1146, 91 L. Ed. 1447.

"*Second,* the federal statutes 'touch a field in which the federal interest is so dominant that the federal system [must] be assumed to preclude enforcement of

state laws on the same subject.'" *Pennsylvania v. Nelson, supra,* at 504, citing *Rice v. Santa Fe Elevator Corp., supra,* at 230, citing *Hines v. Davidowitz* (1941), 312 U. S. 52, 61 Sup. Ct. 399, 85 L. Ed. 581.

"*Third,* enforcement of state sedition acts presents a serious danger of conflict with the administration of the federal program." *Pennsylvania v. Nelson, supra,* at 505.

The appellant asserts that all three of the above grounds are applicable to the instant case and preempt the state's jurisdiction to prosecute crimes peripherally involving the selective service system of the United States.

While in a proper case the criteria urged by appellant are to be given due recognition, we conclude that in the instant case, where the state's conduct neither duplicates nor interferes with the national selective service, the assertions are inconsistent with the constitutional history of our federalism and its underlying concept of dual sovereignties. These doctrines were expounded by Mr. Chief Justice WAITE in *United States v. Cruikshank* (1875), 92 U. S. 542, 549–551, 23 L. Ed. 588:

"We have in our political system a government of the United States and a government of each of the several States. Each one of these governments is distinct from the others, and each has citizens of its own who owe it allegiance, and whose rights, within its jurisdiction, it must protect. The same person may be at the same time a citizen of the United States and a citizen of a State, but his rights of citizenship under one of these governments will be different from those he has under the other. *Slaughter-House Cases,* 16 Wall. 74.

". . . In the formation of a government, the people may confer upon it such powers as they choose. The government, when so formed, may, and when called upon should, exercise all the powers it has for the protection of the rights of its citizens and the people within its jurisdiction; but it can exercise no other. The duty of a government to afford protection is limited always by the power it possesses for that purpose." 92 U. S. at 549.

"The people of the United States resident within any State are subject to two governments: one State, and the other National; but there need be no conflict between the two. The powers which one possesses, the other does not. They are established for different purposes, and have separate jurisdictions. Together they make one whole, and furnish the people of the United States with a complete government, ample for the protection of all their rights at home and abroad. True, it may sometimes happen that a person is amenable to both jurisdictions for one and the same act. Thus, if a marshal of the United States is unlawfully resisted while executing the process of the courts within a State, and the resistance is accompanied by an assault on the officer, the sovereignty of the United States is violated by the resistance, and that of the State by the breach of peace, in the assault. So, too, if one passes counterfeited coin of the United States within a State, it may be an offence against the United States and the State: the United States, because it discredits the coin; and the State, because of the fraud upon him to whom it is passed. This does not, however, necessarily imply that the two governments possess powers in common, or bring them into conflict with each other. It is the natural consequence of a citizenship which owes allegiance to two sovereignties, and claims protection from both. The citizen cannot complain, because he has voluntarily submitted himself to such a form of government. He owes allegiance to the two departments, so to speak, and within their respective spheres must pay the penalties which each exacts for disobedience to its laws. In return, he can demand protection from each within its own jurisdiction."

The state of Wisconsin charged the appellant with the crimes of burglary, theft, and arson. It goes without saying that the perpetration of these crimes results in a breach of the peace of the sovereign state of Wisconsin, and its citizens are justified in demanding the state's protection against such breach. Likewise, he who causes the breach, owing allegiance to two sovereignties, "must pay the penalties which each exacts for disobedience to its laws."

The appellant relies upon *Pennsylvania v. Nelson, supra,* for his three criteria of federal preemption, but conspicuously fails to consider the case of *Gilbert v. Minnesota* (1920), 254 U. S. 325, 41 Sup. Ct. 125, 65 L. Ed. 287, cited with approval therein. In *Gilbert,* a Minnesota statute made it unlawful "to interfere with or discourage the enlistment of men in the military or naval forces of the United States or of the State of Minnesota." The defendant in *Gilbert* was convicted, fined $500, and imprisoned one year for certain utterances against the United States' involvement in the first World War. In addition to a first amendment challenge, not pertinent here, it was argued that "all power of legislation regarding the subject matter contained in the statute [was] conferred upon Congress and withheld from the States." *Gilbert, supra,* at 327. The court stated that the Minnesota statute:

". . . may be supported as a simple exertion of the police power to preserve the peace of the State. As counsel for the State say, 'The act under consideration does not relate to the raising of armies for the national defense, nor to rules and regulations for the government of those under arms. It is simply a local police measure, aimed to suppress a species of seditious speech which the legislature of the State has found objectionable. If the legislature has otherwise power to prohibit utterances of the character of those here complained of, the fact that such suppression has some contributory effect on the federal function of raising armies is quite beside the question.' And the State knew the conditions which existed and could have a solicitude for the public peace, and this record justifies it. Gilbert's remarks were made in a public meeting. They were resented by his auditors. There were protesting interruptions, also accusations and threats against him, disorder and intimations of violence. And such is not an uncommon experience. On such occasions feeling usually runs high and is impetuous; there is a prompting to violence and when violence is once yielded to, before it can be quelled, tragedies may be enacted. To preclude such result or a danger of it is a proper exer-

cise of the power of the State. *Presser v. Illinois*, 116
U. S. 252, 267." *Gilbert, supra*, at 331, 332.

The Minnesota statute upheld by *Gilbert*, proscribing
interference with federal conscription, comes much closer
to encroaching upon a pervasive scheme of congressional
regulation in a field dominated by the federal system
than do the very basic police-power statutes of the state
of Wisconsin in respect to burglary, theft, and arson,
which only incidentally touch upon the conduct which is
also proscribed by the federal law as interfering with the
selective service system.

*Uphaus v. Wyman* (1959), 360 U. S. 72, 79 Sup. Ct.
1040, 3 L. Ed. 2d 1090, upheld the exercise of the state's
police power in the face of a preemption challenge where
the question was much closer than that presented by this
appeal. The New Hampshire Subversive Activities Act
authorized investigations of people thought to be subver-
sive and gave contempt citation powers to the state com-
mission conducting the investigation. The supreme court
upheld the contempt conviction of a person under in-
vestigation who had refused to produce certain records.
In response to the appellant's contention that *Pennsyl-
vania v. Nelson, supra,* was controlling and that the New
Hampshire Act was superseded by the Smith Act, the
court said:

"The argument is that *Nelson,* which involved a prose-
cution under a state sedition law, held that 'Congress has
intended to occupy the field of sedition.' This rule of
decision, it is contended, should embrace legislative in-
vestigations made pursuant to an effort by the Legisla-
ture to inform itself of the presence of subversives within
the State and possibly to enact laws in the subversive
field. The appellant's argument sweeps too broad. In
*Nelson* itself we said that the 'precise holding of the
court . . . is that the Smith Act . . . which prohibits
the knowing advocacy of the overthrow of the Govern-
ment of the United States by force and violence, super-
sedes the enforceability of the Pennsylvania Sedition Act

which proscribed the *same conduct.*' (Italics supplied.) 350 U. S., at 499. The basis of *Nelson* thus rejects the notion that it stripped the States of the right to protect themselves. All the opinion proscribed was a race between federal and state prosecutors to the courthouse door. The opinion made clear that a State could proceed with prosecutions for sedition against the State itself; that it can legitimately investigate in this area follows *a fortiori.*" (p. 76)

The Wisconsin burglary, theft, and arson statutes do not specifically prohibit the felonious breaking into of federal selective service offices, theft from a selective service employee, nor the burning of selective service property. These statutes do not proscribe the "same conduct" as that made criminal by the federal statutes. The instant case is unlike *Pennsylvania v. Nelson,* where the very conduct—sedition against the United States—was prohibited by the Pennsylvania law as well as by the federal law. To hold that the federal law preempts Wisconsin prosecution under these three fundamental police-power statutes would be to strip the state of Wisconsin of its right and duty to protect its citizens.

The appellant has cited no authority realistically analogous to the facts of this case which call for the suspension of such basic state criminal statutes as those involved herein. Nor is the rationale of the cases relied upon convincing here. He contends, however, that the state failed to discuss the case of *Chicago v. Atchison, Topeka & Santa Fe Ry.* (1958), 357 U. S. 77, 78 Sup. Ct. 1063, 2 L. Ed. 2d 1174. The *Santa Fe Case* adds little to appellant's argument. Therein, a city of Chicago ordinance required a new taxi service, which operated between the major railroad terminals in the city, to obtain a certificate of convenience and necessity from the city. The United States Supreme Court held that the federal Interstate Commerce Act precluded the city from enforcing its ordinance. The court cited the section of the

federal act providing that motor vehicle transportation between terminals was to be regarded as railroad transportation and to be subject to the same comprehensive scheme of regulation as the railroads under the Interstate Commerce Act. The court explained its ruling:

"National rather than local control of interstate railroad transportation has long been the policy of Congress. It is not at all extraordinary that Congress should extend freedom from local restraints to the movement of interstate traffic between railroad terminals. Serious impediments to the efficient and uninterrupted flow of this traffic might well result if the City could deny the railroads the right to transfer passengers by their own vehicles or by those of their selected agents." *Chicago v. Santa Fe, supra,* at 87, 88.

Ever since *Gibbons v. Ogden, supra,* the supreme court has zealously guarded the federal government's interest in the free and unimpeded flow of interstate commerce. The *Santa Fe Case* is dubious authority for suspending Wisconsin's burglary, theft, and arson statutes.

Even in *Santa Fe,* where the federal interest in maintaining the unimpeded flow of interstate commerce was the paramount consideration, the court recognized that state police power functions necessary to preserve domestic order within the state remained viable and in full force. The court therein said:

"Of course the City retains considerable authority to regulate how transfer vehicles shall be operated. It could hardly be denied, for example, that such vehicles must obey traffic signals, speed limits and other general safety regulations. Similarly the City may require registration of these vehicles and exact reasonable fees for their use of the local streets. [citing cases] All we hold here . . . is that the City has no power to decide whether Transfer can operate a motor vehicle service between terminals for the railroads because this service is an integral part of interstate railroad transportation authorized and subject to regulation under the Interstate Commerce Act." (pp. 88, 89)

Mr. Justice REED, dissenting in *Pennsylvania v. Nelson,*
*supra,* 350 U. S. 497, 514, relied upon the statement of
Mr. Chief Justice MARSHALL in *Cohens v. Virginia*
(1821), 19 U. S. (6 Wheaton) 264, 443, 5 L. Ed. 257:

" 'To interfere with the penal laws of a State, where
they . . . have for their sole object the internal govern-
ment of the country, is a very serious measure, which
Congress cannot be supposed to adopt lightly, or in-
considerately . . . . It would be taken deliberately, and
the intention would be clearly and unequivocally ex-
pressed.' "

We need not agree with Mr. Justice REED in the appli-
cation of that standard to the facts of *Nelson;* however,
as measured against the facts of the present case, it is
apparent that there was no implied intent to void the
basic police powers of the state even though sanctions
pursuant to such powers were sought to be applied for
crimes concerning property of the United States. Can it
seriously be argued that the arson laws of the state
should not be enforced when a fire is deliberately set, as
alleged here, in a public park of the city of Milwaukee.

The crime against the state of Wisconsin is the illegal
burning of the property of another—any property, irre-
spective of the ownership thereof—with all the attendant
risks to the general public and the affront to the peace
and dignity of the state. The fact that the property was
that of the selective service, a branch of the federal gov-
ernment, may well constitute, as alleged, a federal crime,
but the crime against the peace and dignity of the state
of Wisconsin is a separate and distinct felony and has
for its purpose the protection of an interest different than
that protected by federal law.

While the appellant abjures any confusion between the
doctrine of preemption and double jeopardy, we are con-
strained to conclude that the nexus of his argument—
since it is clear that there is no preemption in the classical
sense of *Pennsylvania v. Nelson*—is that it is violative of

the constitution to twice punish a defendant for the consequences of a single act. In effect, Cullen urges that he ought not be punished or threatened with punishment by both the state of Wisconsin and the United States for a single act. The argument, although asserted only obliquely, is a powerful one, and carries with it the appealing argument that it is fundamentally unfair to punish a man twice for a single act.

We can only say that our law has not yet concluded that punishment by separate sovereignties for the same act constitutes double jeopardy. While *Benton v. Maryland* (1969), 395 U. S. 784, 89 Sup. Ct. 2056, 23 L. Ed. 2d 707, reversed *Palko v. Connecticut* (1937), 302 U. S. 319, 58 Sup. Ct. 149, 82 L. Ed. 288, and a *state* now may not twice place a defendant in jeopardy for a single crime, significantly, *Bartkus v. Illinois* (1959), 359 U. S. 121, 79 Sup. Ct. 676, 3 L. Ed. 2d 684, was not reversed; and as federal law now stands, a defendant may be placed in jeopardy for the same crime by separate state and federal prosecutions. It should be noted that the vigorous dissent of Mr. Justice BRENNAN in *Bartkus* was occasioned primarily by the fact that the *federal* authorities had urged and in fact initiated the state prosecution after the case against Bartkus had been dismissed in the federal court. The principal vice, though not the only one, that Mr. Justice BRENNAN saw in *Bartkus* was not that the state had commenced a separate prosecution, but that in fact the second prosecution was at the behest of the Federal Bureau of Investigation and was a "second kick at the cat" by the United States Attorney and not a bona fide state prosecution. There is not a penumbra that such is the case herein. The writer of this opinion, speaking for himself and not necessarily for the court, nonetheless perceives a fundamental unfairness of *punishing* a defendant twice for the same act, but this state of affairs has not arisen. Cullen has not yet been bound over to the state trial court, and the federal viola-

tion is at the immediate post-indictment stage. We need not postulate as yet unresolved constitutional inequities that could arise in the event of conviction in both jurisdictions. Nor do we anticipate that it would be impossible for a defendant convicted under these circumstances to serve a state and federal sentence concurrently in the same institution.

We are satisfied under the doctrine of *Dore* that the alternative writ of prohibition should be quashed and that the order of the circuit court must be affirmed.

*By the Court.*—Order affirmed.