**UNITED STATES of America**

v.

**James L. BEST.**

**Cr. No. 83–0013.**

United States District Court,
District of Columbia.

April 21, 1983.

Theodore A. Shmanda, Asst. U.S. Atty., Major Crimes Div., Washington, D.C., for plaintiff.

Thomas Lumbard, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

BRYANT, District Judge.

On April 6, 1983, the court granted the motion of defendant James L. Best to suppress all physical evidence seized by the government at the time of his arrest and all statements made by him while in police custody following his arrest. The court now sets forth the reasons for its decision.

A. *Factual Background: The Search and Arrest*

The factual background of this case was examined at a full-day hearing held on March 10, 1983. At this hearing, the court received testimony from three witnesses for the defendant—the defendant himself; Mr. Lawrence Troy Hart, who was arrested along with the defendant;[1] and Ms. Valerie Davis, the defendant's girl friend—and three witnesses for the government—police officers Michael P. Wilson, Edward W. Minnis, Jr., and Samuel Prue, all of whom were present when the defendant was searched and arrested.

With a few significant exceptions, which are discussed in Part C below, the facts of this case are not in dispute. In the early afternoon of December 11, 1982, defendant

Best was sitting in his car talking with his friend Lawrence Troy Hart. The car was parked in a parking lot behind a public housing project near Kenilworth Avenue and Quarles Street, N.E. It was not unusual for the defendant to park his car there because he frequently visited Ms. Davis, who lived in the housing project.

On the day in question, there were several men standing in a group near the defendant's car, some of whom had been previously arrested for selling drugs in the parking lot. There was also a woman in the parking lot, who was walking towards an alley which leads out to the shopping district on Kenilworth Avenue.

Suddenly and without warning, several police cars drove through the alley and into the parking lot. At the same time, several policemen approached on foot from the direction of the housing project. Cocking their shotguns, the policemen quickly converged on the defendant's car.

The first policeman to reach the car was Officer Michael P. Wilson. At the suppression hearing, Officer Wilson testified that his attention was drawn to the car by a furtive movement made by the defendant, who was sitting in the driver's seat. Officer Wilson testified that the defendant appeared to be reaching under the driver's seat. When Officer Wilson approached the car, he went to the passenger's side, where Mr. Hart was sitting, and ordered the men to get out of the car. Officer Wilson placed Mr. Hart against the hood, ordered him to take everything out of his pockets, and frisked him.

Meanwhile, the defendant, who had gotten out of the car in response to Officer Wilson's order, was taken by Officer Edward Minnis to a low chain-link fence at the edge of the parking lot. He was joined there by the group of men who had been standing near his car. All the men were told to empty their pockets and were frisked. The woman who had been walking towards the alley was picked up and also placed against the fence.

---

1. All charges placed against Mr. Hart were    subsequently dropped.

While this was going on, Officer Wilson finished frisking Mr. Hart and, leaving Mr. Hart with another officer, began to examine the passenger's side of the interior of the car. Finding nothing there, he walked around the front of the car to the driver's side, where, he claimed, he looked through the open door and saw the butt end of a pistol sticking out in plain view from beneath the driver's seat.

He entered the car and looked under the seat. There he found not only a gun, but also a black leather pouch containing plastic envelopes of heroin. He handed the leather pouch out to another officer, who, in turn, held it up for the other policemen to see. Officer Wilson said that he left the gun on the floor of the car so that it could be processed for fingerprints.

Further search of the car uncovered a number of empty plastic bags, a machine for sealing the bags, and three $10 rolls of quarters in the trunk.[2] During the frisks, $50 was also seized from Mr. Hart,[3] and $253 from the defendant. The defendant also handed the officer who was frisking him an envelope which contained a small amount of marijuana.

Following the search, the defendant and Mr. Hart were formally placed under arrest, handcuffed, put in a police wagon, and taken to the Sixth District station, where they were stripped searched and locked up. After being advised of his right to remain silent, the defendant acknowledged that the drugs and the gun were his and emphasized that nothing taken from his car belonged to Mr. Hart.

**B.  *Factual    Background:    The    Police "Sweep" Tactics***

According to the unanimous testimony of both the defendant's witnesses and the government's witnesses, the "sweep" tactics that resulted in defendant Best's arrest were (and perhaps continue to be) commonly used by the police in the Quarles Street area. It was obvious from the testimony of the defendant's three witnesses that as residents of that area, they were thoroughly familiar with the sweeps. Ms. Davis testified that on December 11, when she heard the sound of shotguns being cocked, she knew from experience that another sweep was beginning. She said that the police, whom she called "the jump-out boys,":

> ride through the alley, jump out cocking their guns stopping everybody and anything that's in their way . . . telling them empty their pockets, up against the fence . . . . They never say [what they are looking for]. If you ask them questions, next thing you know you are down there for disorderly conduct. [Transcript of March 10, 1983, Hearing at 33.]

The defendant testified in similar fashion and added that:

> When I saw them coming up the alley and I noticed these four or five people standing in front of me then I knew that that was going to be the place that they stopped because whenever they come they only stop if it's a crowd or a gathering. If anything more than three or four people are standing in one spot when they come through that's where they are

---

**2.**  The discovery of heroin, empty plastic bags, and a sealing machine might ordinarily suggest that their possessor was engaged in large-scale drug distribution. However, at the suppression hearing, defendant Best offered another explanation. He claimed that he had found the heroin, bags, sealing machine, and pistol in a paper bag in an abandoned car in the same parking lot where he was arrested. The defendant said that as a frequent visitor to the housing project, he knew that the abandoned car was used as a drop-off point for local drug dealers. He said that on the night before his arrest, while sitting in Ms. Davis' apartment, he saw a man place the bag in the abandoned car. In

hopes of finding something valuable, he went out to the abandoned car, removed the paper bag, put it in his car, and quickly drove off. He said that later, after he had examined its contents, he hid the gun and the heroin under the front seat of the car and put the remaining things in the trunk. He said that he intended to sell the drugs and the gun as soon as possible. At the suppression hearing, the government did not seriously challenge this account.

**3.**  Despite the fact that the Department had dismissed all charges against Mr. Hart, at the time of the suppression hearing, Mr. Hart had still not been able to recover his money.

going to make their initial stop at. [Transcript at 89.] [4]

Mr. Hart, who described the police tactic as "swarming," testified that on a previous occasion, while walking through the alley to the store, he had been caught up in one of the sweeps, searched at gunpoint, and told not to walk there again.

The most precise testimony concerning the sweep tactics was given by Sergeant Prue, the commanding police officer, as follows:

> A. Well, I have ten people assigned to my unit and I went to the commanding officer of the district and he assigned me 15 more people. We decided to use these 25 people and about four or five vehicles that were made available to me.
>
> Q. [By the court] What is the modis operendi? What tactics did you use?
>
> A. ... We wouldn't even worry if there was anybody there or not. We would just pick a particular location, that alley, and then we would cover all escape routes from that alley and just pull up in the cars, block the escape routes and then move in towards the center of the alley.
>
> Q. What would you do?
>
> A. Stopped everybody that was there.
>
> . . . .
>
> Q. ... There has been some testimony about people around cars from time to time congregated around automobiles. Would you order people out of cars?
>
> A. Yes, Sir.
>
> Q. You would?
>
> A. Yes, Sir.
>
> Q. If you went into an area and you suspected narcotics activity you order people out of the automobiles?
>
> A. Yes, Sir.
>
> Q. And you would search them?
>
> A. Yes, Sir.
>
> Q. What about the automobiles? Search the automobile too?
>
> A. No, Sir, not search the automobile. We would, as the people exited the automobile we would look inside the space of the automobile that were readily available, the areas that you could see into.
>
> Q. That's the modis operendi?
>
> A. Yes, Sir.
>
> Q. Sir, if I was sitting in a car and you folks came up with one of those— what do you call that business, one of those flying squadron things—
>
> A. Yes, Sir.
>
> Q. If I was sitting in the car, you ordered everybody out of the car, get out of the car.
>
> A. Yes, Sir.
>
> Q. And you searched me.
>
> A. Pat you down for weapons, Sir.
>
> Q. Pat me down for weapons.
>
> A. Yes, Sir. That would be more appropriate.
>
> Q. Then what would you do?
>
> A. If you didn't have any weapons we would identify you and let you know what we were doing, that we were there investigating the narcotics activity that we had complaints of and let you know that this kind of thing would be going on in the area and if you didn't have business in the area, you didn't live in the area and you were congregating here with what we knew to be known criminals—
>
> Q. It's going to happen to you again?
>
> A. Yes, Sir. [Transcript at 183–84.] [5]

C. *Factual Disputes*

The only significant factual dispute in this case involves the government's contention that the police had specific reasons for focussing their investigative attention on defendant Best. This contention rests on Officer Wilson's testimony at the suppression hearing that (a) he approached the defendant's car and ordered the occupants to get out in response to a suspicious move-

---

4. The defendant's hunch was confirmed later in the suppression hearing when Officer Minnis testified that "[i]t was the people standing ... close to the car and they attracted our attention first." Transcript at 173.

5. *Accord,* testimony of Officer Wilson, transcript at 118–21.

ment made by the defendant, who was sitting in the driver's seat, and (b) he searched under the driver's seat of the car only after first seeing the butt end of a gun sticking out in plain view from beneath the seat. The defendant vigorously disputed both of these claims.

In assessing the credibility of Officer Wilson's testimony, the court applies the same kinds of tests as it would ask jurors to apply in their factfinding.[6] It is the court's considered judgment that in light of these common-sense tests, Officer Wilson's testimony concerning the two points noted above must be rejected as unworthy of belief.

In the first place, Officer Wilson did not testify in a forthright manner. On the witness stand, he behaved in a nervous and evasive manner, so much so that the court found it necessary to try to pin him down on two occasions. *See* transcript at 119 and 125.

Secondly, Officer Wilson's testimony at the suppression hearing contradicted his earlier sworn testimony in critical areas, and the officer was unable to reconcile the discrepancy. At the suppression hearing, he testified with seeming confidence and certainty that he saw the pistol while looking through the open door of the defendant's car. However, at the preliminary hearing held before the Magistrate, Officer Wilson categorically stated that he saw the pistol while peering through the windshield of the car.

Thirdly, Officer Wilson's testimony was contradicted by what the court finds to be credible testimony of other witnesses. The defendant testified that once he saw the police cars driving into the alley, he knew that he and his car would be searched. He testified that he made no effort to avoid or resist the search. He also testified that both the gun and the heroin pouch were hidden far back under the seat and out of plain view. He and Ms. Davis testified that the seat of the defendant's car was covered with an old blanket, which had the effect of obscuring from view what was under the seat. While on the witness stand, both the defendant and Ms. Davis behaved in a natural and forthright manner which sharply contrasted with that of Officer Wilson.

Finally and perhaps most importantly, Officer Wilson's testimony revealed itself as being incredible in the face of his actual conduct at the time of the defendant's arrest. Officer Wilson maintained that as he approached the defendant's car, he looked through its rear window and saw the driver make a furtive movement, as if touching something under the seat. But when he reached the defendant's car, he went directly to the passenger's side of the car, ordered the passenger out of the car, paying strict attention to the passenger, his movements, and the place where he had been sitting. As to the driver, who allegedly made the furtive movement, he paid no attention. *See* transcript at 138. The court finds it incredible that a person would find something that he deemed significant and then ignore it, especially when what was at stake was his own physical safety.

For all these reasons, the court is forced to reject Officer Wilson's testimony to the extent that it would lend any uniqueness to the search of the defendant. The court finds as a matter of fact that the police neither approached the defendant's car in response to seeing some furtive gesture nor searched the car only after first seeing a gun in plain sight.

The court's confidence in this finding is strengthened by the undisputed fact that when the police conducted sweeps of the Quarles Street parking lot, their standard procedure was to search and interrogate anyone they found there and to order everyone out of their cars. What happened on December 11, 1982, was not a breakdown in the Department's investigative procedures, but simply their normal functioning.

---

**6.** *See* District of Columbia Criminal Jury Instruction No. 2.11, "Credibility of Witness," (3rd Ed.1978).

### D. *Law*

The government has attempted to justify the detention and search of defendant Best on authority of *United States v. White*, 648 F.2d 29 (D.C.Cir.1981). But, as the government acknowledges, the facts in *White* differ in significant ways from those in the instant case. In *White*, the police acted on a tip specifically directed at the defendant and established surveillance of the defendant's car before approaching it. None of that occurred here.

The court knows of no legal basis for the sweep tactics employed by the police in this case. The fourth amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated". The fourth amendment "protects people, not places," *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), and applies "whenever a police officer accosts an individual and restrains his freedom to walk away," *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). There can be no question that when the police conducted sweeps in the Quarles Street area and searched people at gunpoint, they were "restrain[ing] their freedom to walk away".

Even a mere investigative stop of the type discussed in *Terry, supra*, cannot be justified simply because a person is found in an area with a high incidence of drug traffic, looks unfamiliar and suspicious to the police officer, but has done nothing to create suspicion of "any specific misconduct," *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). The police must have, in Judge Leventhal's words, a "founded suspicion of wrongdoing," *United States v. Montgomery*, 561 F.2d 875, 880 (D.C.Cir.1977).

Moreover, as this circuit recently stated in *Gomez v. Turner*, 672 F.2d 134 (D.C.Cir. 1982):

Appellant suggests that an MPD contact, even if a seizure, "constitutes such a minor intrusion upon a pedestrian's privacy that it need not be justified by a reasonable, articulable suspicion of criminal conduct, much less probable cause, and such questioning is proper as long as it is not wholly capricious." ... The Supreme Court has recognized that brief, relatively unintrusive detentions—termed "stops"—may be "reasonable" if based upon an articulable suspicion.... More intrusive detentions are reasonable only if supported by probable cause.... The law is unsettled concerning the point at which a "stop" ripens into a detention that requires probable cause. In any event, the Court has stated that "any curtailment of a person's liberty by the police must be supported *at least* by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." ... Accordingly, we decline appellant's invitation to find that a contact, even if a seizure, is reasonable although not based upon *any* recognized objective standard. [*Id.* at 139–40, n. 9.]

This is not a case that calls on the court to determine whether the line between an investigatory stop and an arrest was crossed. Even when judged under the less restrictive standards of a stop, the detention and search of defendant Best cannot stand. The police had no reason to suspect the defendant of any specific misconduct and cannot ascribe his detention and search to any exigent circumstances. Their action was prompted rather by a policy which takes legal shortcuts in dealing with drug trafficking, at least in Mr. Best's part of town.

Indiscriminate sweeps may be an effective tactic for moving drug traffic from one place, where it bothers the citizens, to another, where it causes less initial citizen concern. But when tested by the standards of the Fourth Amendment, its legitimacy is nonexistent. What happened in this case is perhaps best put in perspective by the words of Judge Edwards in *United States v. White*:

This case arose in the inner-city of Washington, D.C. One wonders whether police officers ... would accost well-to-do resi-

dents in one of the affluent suburbs near Washington (where drug peddling is known to be prevalent), in the same manner that they accosted the appellant here. It is doubtful. [648 F.2d at 46 (Edwards, J., dissenting).]

E. *Conclusion*

For the reasons discussed above, it is hereby ORDERED that defendant's motion to suppress is granted.