STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Marvin R. WILLIAMSON, Jr., Defendant-Appellant.

Supreme Court

*No. 81–1961–CR. Argued March 31, 1983.—Decided July 1, 1983.*

(Also reported in 335 N.W.2d 814.)

For the petitioner the cause was argued by *Stephen W. Kleinmaier*, assistant attorney general, with whom on the briefs was *Bronson C. La Follette*, attorney general.

For the defendant-appellant there was a brief and oral argument by *Peter D. Goldberg*, assistant state public defender.

DAY, J. This is a review of a decision of the court of appeals published at 109 Wis. 2d 83, 325 N.W.2d 360 (Ct. App. 1982). The decision reversed a judgment of a conviction entered against the defendant, Marvin R. Williamson, Jr., (Williamson), in the Circuit Court for Milwaukee County, Honorable Lee E. Wells, Judge. Williamson was convicted of one count of carrying a concealed weapon in violation of sec. 941.23,[1] Stats. 1979–80.

Two issues are considered in this review: First, in order to withstand a motion to dismiss the complaint for insufficiency, is it necessary for a misdemeanor complaint which alleges possession of a concealed weapon to set forth facts showing that the underlying stop and frisk which led to the seizure of the weapon was constitutionally valid?

Second, did the stop and frisk of Williamson meet statutory and constitutional standards so that the weapon seized as a result of the frisk could be properly admitted into evidence?

We conclude the complaint was legally sufficient and affirm the court of appeals on this issue. We also conclude that the stop and frisk of Williamson was con-

[1] Section 941.23, Stats. (1979–80) reads:
"**Carrying concealed weapon.** Any person except a peace officer who goes armed with a concealed and dangerous weapon is guilty of a Class A misdemeanor."

ducted in conformity with statutory and constitutional requirements. We therefore reverse the court of appeals on this issue and affirm the judgment of conviction.

At approximately 2:00 a.m. on January 2, 1981, Milwaukee Police Officer Charles Berard (Berard) and his "partner" were parked in front of a closed tavern at 1016 West Center Avenue in Milwaukee. Their car's headlights were off but the rotating lights were on and activated. They had shortly before been involved in a traffic stop and the person involved in that incident had just been taken from the scene by a police vehicle.

As the officers sat in their car writing out tickets, they observed two men exiting the yard of 1020 West Center Avenue. The men turned toward the tavern and began walking. Apparently they did not immediately recognize that a police car was parked there because, as Berard testified, "They seemed startled when they first realized we were there."

According to Berard, after the men recognized the squad car, one of them (Williamson) "hesitated and just began staring at the squad car from in front of the . . . car" and the other, Myles King (King) "continued to where the passenger door is on the sidewalk and just stood there looking at my partner."

After the staring continued for a short while, Berard's partner rolled down the car's window and Berard requested King to come over to the car. Berard then asked King what he was doing and what he was looking at to which King responded, "Huh?" Berard then asked King if he had ever been convicted of a crime and King answered, "Yes, carrying a gun." At that point, Berard asked King if he was currently "wanted" and King responded, "Yeah."

Berard and his partner then exited from their car. Berard stated that at that point he "feared for my safety and the safety of my partner, being one subject

had previously had a gun, and [both men] were acting funny, in relation to the other subjects that normally pass you on the street."

Officer Berard approached Williamson who, as Berard exited from the car, had turned and started to walk away from the car. Berard asked Williamson to, "Hold up a second, chief," which caused Williamson to stop and turn back towards Berard. At that time, Berard told Williamson to keep his hands away from his body and asked him if he had any weapons on his person. Williamson did not respond so Berard told him he was going to check for weapons. Berard proceeded to perform a pat down search of Williamson's outer clothing. He felt a bulge in Williamson's coat pocket and retrieved a loaded twenty-two caliber pistol from the jacket. Berard then arrested Williamson for carrying a concealed weapon.

In response to questions at the suppression hearing, Berard articulated the following factors which led to his stopping and frisking Williamson:

"1. Williamson and King were acting in a suspicious manner in stopping and staring at the police car;

"2. King admitted that he had been previously convicted for carrying a concealed weapon and was currently 'wanted;'

"3. Berard's past experience was that a person who had carried a gun once frequently carried it again;

"4. Knowing that King had been convicted of carrying a weapon and that he was currently wanted caused Berard to believe that Williamson might also be carrying a weapon;

"5. As Berard exited the car, Williamson turned away and his hands were no longer observable by Berard so that Berard would see if a weapon was being drawn; and

"6. Visibility was poor—the incident occurred at 2:00 a.m."

A complaint charging Williamson with carrying a concealed weapon was issued. Williamson filed two motions,

one to dismiss the complaint on the grounds that it was insufficient and that the stop and frisk of the defendant was unconstitutional and the second to suppress any evidence seized by virtue of the alleged unconstitutional stop and frisk.

A hearing was held on the motions on February 26, 1981, before Judge Rudolph Randa. On July 8, 1981, Judge Randa filed a written decision which denied Williamson's motions. He found that there were "more than sufficient facts to justify the stop and search."

A hearing was held on the morning of August 31, 1981, before Judge Wells[2] at which Williamson waived his right to a jury trial. It was stipulated that the transcripts of the February 26, 1981, suppression hearing be used for the trial. That afternoon a trial to the bench was commenced. On September 2, 1981, Williamson was convicted of carrying a concealed weapon. He appealed the judgment of conviction.

The court of appeals found the complaint sufficient to withstand a motion to dismiss. However, it concluded that Williamson's conduct was not sufficiently suspicious to justify the stop and frisk. The court of appeals therefore reversed the judgment of conviction.

The first issue on review is whether it is necessary for a misdemeanor complaint which alleges possession of a concealed weapon to set forth facts showing that the underlying stop and frisk which led to the seizure of the weapon was constitutionally valid?

In order for a complaint to withstand a motion to dismiss, it must follow the form set out in sec. 968.01, Stats. 1979–80.[3] A complaint is sufficient when it an-

---

[2] Between the time of the decision on the motions and the date of trial, Judge Randa left the circuit court for the court of appeals.

[3] Section 968.01, Stats. (1979–80) reads:

"968.01 **Complaint.** The complaint is a written statement of the essential facts constituting the offense charged. It may be made on information and belief. It shall be made upon oath before a district attorney or judge as provided in this chapter."

swers six questions: "What is the charge? Who is charged? When and where is the offense alleged to have taken place? Why is this particular person being charged? [and] Who says so?" *State v. Williams,* 47 Wis. 2d 242, 254, 177 N.W.2d 611 (1970), quoting from *State ex rel. Evanow v. Seraphim,* 40 Wis. 2d 223, 230, 161 N.W.2d 369 (1968).

The trial court found the complaint sufficient. The court of appeals reviewed the complaint and determined it answered the six questions set out above.[4] *William-*

---

[4] The complaint reads in part as follows:

*"THE ABOVE NAMED COMPLAINING WITNESS BEING DULY SWORN SAYS THAT THE ABOVE NAMED DEFENDANT IN THE COUNTY OF MILWAUKEE, STATE OF WISCONSIN,* on January 2, 1981, at 1016 W. Center Street, City of Milwaukee, not being a peace officer, did go armed with a concealed and dangerous weapon, contrary to Wisconsin Statutes section 941.23(1).

"Upon conviction of this charge, a Class A Misdemeanor, the maximum possible penalty is a fine of not more than $10,000 or imprisonment for not more than 9 months or both.

"Complainant states he is a City of Milwaukee Police Officer and makes this complaint based upon the following:

"Complainant further states that on January 2, 1981, at 1016 W. Center Street, City and County of Milwaukee, State of Wisconsin, he searched the above defendant; that at that time your complainant found concealed in the right outer coat pocket of a coat that the defendant was wearing a loaded .22 cal. revolver."

The court of appeals determined that the complaint answered the six questions as follows:

| | |
|---|---|
| "What is the charge? | "Marvin R. Williamson was carrying a concealed weapon in violation of 941.23, Stats. |
| "Who is charged? | "Marvin R. Williamson is charged. |
| "When and where is the offense alleged to have occurred? | "It occurred Janauary 2, 1981, at 1016 West Center Street, Milwaukee, Wisconsin. |
| "Why is this particular person being charged? | "He was searched and a loaded .22 caliber revolver was found in his pocket. |
| "Who says so? | "Police officer Charles Berard." 109 Wis. 2d at 89. |

*son,* 109 Wis. 2d at 89. It therefore affirmed the trial court on this issue.

The defendant apparently does not dispute the fact that the complaint answers the six questions. He argues, however, that given the constitutional requirement of a timely judicial determination of probable cause, *Gerstein v. Pugh,* 420 U.S. 103, 126 (1975), it is necessary for a complaint in a misdemeanor which charges the crime of possession to show that the weapon was constitutionally seized by the police. The defendant reasons that in a misdemeanor proceeding there is no provision comparable to a preliminary hearing in a felony case at which a determination of probable cause may be made. This being the case, in a misdemeanor the probable cause determination must be made at the initial appearance. At the initial appearance, the complaint is the only source of information on the case that is available to the court. Therefore, if a determination of probable cause requires an initial decision that, where a stop and frisk is involved, it was constitutionally valid, then the misdemeanor complaint must show sufficient facts to justify the police action.

The problem with this reasoning is that it is based on the premise that a determination of probable cause requires the State to show the evidence was obtained legally. That is not the law.

For a complaint to state probable cause, "the information presented to the magistrate . . . must be sufficient for him to conclude that 'the charges are not capricious and are sufficiently supported to justify bringing into play further steps of the criminal process.' " *Williams,* 47 Wis. 2d at 252, quoting *State ex rel. Cullen v. Ceci,* 45 Wis. 2d 432, 444, 173 N.W.2d 175 (1970) ; quoting *Jaben v. United States,* 381 U.S. 214, 224–225 (1965).

Here, the complaint states sufficient facts to insure the charge is not capricious. To determine whether it

is necessary to set out facts showing that stop and frisk was constitutionally valid before further steps in the criminal process can be taken, we turn to the standards required for a grand jury returning an indictment.

This court has equated the burden of proof applicable to a grand jury indictment with that of probable cause at a preliminary hearing. *State ex rel. Welch v. Waukesha Co. Cir. Court,* 52 Wis. 2d 221, 224–25, 189 N.W.2d 201 (1971). The United States Supreme Court in *United States v. Calandra,* 414 U.S. 338 (1974), held that a witness in a grand jury proceeding could not refuse to answer questions on grounds that the questions were based on evidence resulting from an illegal search and seizure. As part of the reasoning leading to that holding, the Court noted that it had previously held that the,

"validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence; or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." *Calandra,* 414 U.S. at 344–345. (Cites omitted.)

Just as an indictment is not subject to challenge because it is based on incompetent or inadequate evidence, neither is a complaint. A function of the grand jury is to determine whether probable cause exists to believe a crime has been committed. *Calandra,* 414 U.S. at 343. The grand jury's decision as to the existence of probable cause does not depend on whether the evidence before it was obtained in a constitutionally valid manner. Neither does a finding of probable cause in a complaint require such a showing.

Our system of justice leaves the question of whether the evidence was obtained constitutionally to be deter-

mined in a suppression hearing following the initial appearance in a misdemeanor case. Section 971.31(2) and (5)(a), Stats 1981-82.[5] Evidence which is obtained through unconstitutional means may be inadmissible at trial but still used as the foundation for a complaint. *Gelhaar v. State,* 58 Wis. 2d 547, 559, 207 N.W.2d 88 (1973). It follows that a decision as to whether there is probable cause to believe that a crime has been committed does not require consideration of whether the evidence was seized in a constitutional manner. Therefore, it was unnecessary for the State to set out in its complaint facts sufficient to show that the stop and frisk here was constitutionally valid.

Contrary to Williamson's contention on review, this court's holding in *State ex rel. Pflanz v. County Court,* 36 Wis. 2d 550, 153 N.W.2d 559 (1967), is not contrary to the result here. In *Pflanz,* this court found a complaint insufficient because it failed to disclose the identity and ability of a complainant to investigate the tax status of the defendant in a tax fraud case. *Pflanz,* 36 Wis. 2d at 561-562. The court noted that "Without [the agent's] identity as a tax agent of the tax depart-

---

[5] Section 971.31(2) and (5)(a), Stats. (1981-82) reads:

"971.31 **Motions before trial.** . . . (2) Except as provided in sub. (5), defenses and objections based on defects in the institution of the proceedings, insufficiency of the complaint, infcrmation or indictment, invalidity in whole or in part of the statute on which the prosecution is founded, or the use of illegal means to secure evidence shall be raised before trial by motion or be deemed waived. The court may, however, entertain such motion at the trial, in which case the defendant waives any jeopardy that may have attached. The motion to suppress evidence shall be so entertained with waiver of jeopardy when it appears that the defendant is surprised by the state's possession of such evidence. . . .

"(5)(a) Motions before trial shall be served and filed within 10 days after the initial appearance of the defendant in a misdemeanor action or 10 days after arraignment in a felony action unless the court otherwise permits."

ment his competency to determine a crime involving fraudulent tax returns is not established as a basis upon which an independent magistrate could accept his judgment that a crime had been committed." *Pflanz*, 36 Wis. 2d at 562.

Here, Berard is identified in the complaint as a police officer who had actually searched the person and discovered a loaded gun. That information formed a sufficient basis upon which a magistrate could accept Berard's judgment that a crime had been committed.

That part of the decision of the court of appeals that the complaint was sufficient is affirmed.

The second issue is: Did the "stop and frisk" of Williamson meet statutory and constitutional standards so that the weapon seized as a result of the frisk could be properly admitted into evidence?

The state contends that the stop and frisk of Williamson was authorized by the United States Supreme Court decision in *Terry v. Ohio*, 392 U.S. 1 (1968) and by sections 968.24[6] and 968.25,[7] Stats. 1979–80. This court

[6] Section 968.24, Stats. (1979–80) reads:

"**Temporary questioning without arrest.** After having identified himself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of his conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped."

[7] Section 968.25, Stats. (1979–80) reads:

"**Search during temporary questioning.** When a law enforcement officer has stopped a person for temporary questioning pursuant to s. 968.24 and reasonably suspects that he or another is in danger of physical injury, he may search such person for weapons or any instrument or article or substance readily capable of causing physical injury and of a sort not ordinarily carried in public places by law abiding persons. If he finds such a weapon or instrument, or any other property possession of which he reasonably believes may

has recognized that these two sections are the "statutory expression" of the constitutional requirements set down in the *Terry* decision. *State v. Flynn,* 92 Wis. 2d 427, 438, 285 N.W.2d 710 (1979); *State v. Goebel,* 103 Wis. 2d 203, 209, 307 N.W.2d 915 (1981). Therefore, in interpreting the scope of the statutes, resort must be made to *Terry* and cases following it.

*Terry* involved a police officer who observed the defendant and another man walking up and down a street five to six times apiece, stopping only to peer into a store window. The officer suspected the two men of "casing a job, a stickup" and approached the men to investigate further. As he approached, he identified himself as a police officer and asked the men for their names. When the men only mumbled a response, the officer grabbed the defendant, spun him around, and patted down his outer clothing. The officer discovered a weapon.

The Supreme Court held that the stop and frisk did not violate the Fourth Amendment's proscription against unreasonable search and seizures. In so holding the Court stated that,

> "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover

---

constitute the commission of a crime, or which may constitute a threat to his safety, he may take it and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest the person so questioned."

weapons which might be used to assault him." 392 U.S. at 30.

The reasonableness standard set out in *Terry* is an objective one. *Terry,* 392 U.S. at 21; *Bies v. State,* 76 Wis. 2d 457, 466, 251 N.W.2d 461 (1977). In order to justify a particular stop and frisk, the officer "must be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21. A stop based simply on an officer's "inchoate and unparticularized suspicion or 'hunch' " will not pass the constitutional text. 392 U.S. at 27.

Once the officer has articulated the facts which caused him to act, those facts are assessed against an objective standard: "Would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry,* 392 U.S. at 21–22.

In reviewing a trial court's order denying a motion to suppress, this court will uphold the court's findings of fact unless they are against the great weight and clear preponderance of the evidence. *Bies v. State,* 76 Wis. 2d at 469. However, this court will independently examine those facts to determine whether the constitutional requirement of reasonableness is satisfied.

We conclude that the facts as articulated by Berard and as found by the trial court would have warranted a man of reasonable caution in the belief that some criminal activity was possibly afoot. We also conclude that Berard was justified in believing that Williamson might be armed and dangerous. Therefore the stop and frisk did not violate Williamson's right to be free from unreasonable searches and seizures.

Berard did not have to have probable cause that a crime had taken place in order to stop Williamson. As the United States Supreme Court noted in *Adams v. Williams,* 407 U.S. 143, 146 (1972), "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

There is no set standard for what constitutes a reasonable police reaction in all situations. Rather, the reasonableness of the reaction depends upon the circumstances facing the officer. *Bies,* 76 Wis. 2d at 468, fn. 7. The court must examine the totality of the circumstances to determine whether the stop and frisk was justified. *Penister v. State,* 74 Wis. 2d 94, 100, 246 N.W.2d 115 (1976).

Examining the facts as stated by Berard along with all reasonable inferences that can be drawn from them, we believe that Berard could reasonably conclude that Williamson had been or was about to be engaged in criminal conduct. Berard spotted the defendant as he and King exited from a yard at 2:00 a.m. As each man saw the squad car, he stopped and stared at it. When Berard asked King if he had ever been convicted of a crime, King answered "yes" and volunteered that the crime was "carrying a gun." King also admitted that he was currently "wanted."

As Berard exited the car, Williamson turned away. It was dark and Berard could not see Williamson's hands. Given the time of night and the low visibility, the act of turning away could reasonably be viewed as threatening. Berard noted that at the time he felt Williamson might be carrying a weapon and believed his and his partner's lives might be in danger.

From the record, it is clear that Berard believed that Williamson might be carrying a weapon. He also apparently believed that he was in some danger of assault. A man of reasonable caution would be justified in reaching either of those conclusions so that at least some further investigation would be required.

We therefore conclude that the seizure of Williamson was constitutionally permissible.

Although the stop of Williamson was justified, it does not automatically follow that a pat-down search could be conducted. *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979). A frisk was justified only if Berard could reasonably believe that "in light of his experience . . . the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30.

The court of appeals opinion below suggests that a police officer must first question a person they have stopped as to his name, address and reason for his conduct before a frisk is allowed unless there exists some "exigent circumstances compelling an immediate frisk. . . ." *State v. Williamson*, 109 Wis. 2d at 95.

This language is misleading. A police officer *may* make inquiries of the person once a stop is made before a frisk begins. Section 968.24, Stats. However, since a frisk may be carried out only if the officer reasonably believes the person may be armed and dangerous, requiring an officer to wait until a few questions are asked before a protective frisk may be done may result in the officer's inquiries being answered with a bullet. We agree with the majority in *Terry* that:

"When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officers or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary

measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." 392 U.S. at 24.

Requiring an officer to first question a person he reasonably believes to be armed and presently dangerous before a protective search is done will deny, at least for a short while and perhaps forever, the officer's power to neutralize the threat of physical harm. We therefore conclude that to the extent the court of appeals opinion can be read as requiring an officer to question a person before a frisk is done, the language is overruled.

We conclude that Berard had reasonable grounds to believe Williamson might be armed and dangerous. This justified the frisk.

The stop and frisk of Williamson did not violate the constitutional protection against unreasonable searches and seizures. And, because secs. 968.24 and 968.25, Stats. are the legislative expression of that constitutional right, neither of those statutes was violated when Williamson was stopped and frisked.

*By the Court.*—Decision of the court of appeals is affirmed in part and reversed in part; judgment of conviction is affirmed.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). I dissent from the majority's holding that the stop and frisk in this case was constitutionally valid. I would affirm the decision of the court of appeals and hold that the stop and frisk violated the defendant's rights guaranteed by the federal and state constitutions.

Both the Wisconsin Constitution and the United States Constitution are "designed to maximize individual free-

doms within a framework of ordered liberty." *Kolender v. Lawson,* —— U.S. ——, 51 L.W. 4532–4533 (May 2, 1983). Part of the constitutional compromise between freedom and order is found in the prohibitions against unreasonable searches and seizures. U.S. Const. amend IV; Wis. Const. art I, sec. 11. These constitutional prohibitions establish a delicate balance between citizens' ability to walk in our neighborhoods, free from the fear that our everyday actions will subject us to police stops and searches, and the necessity for the state, through its police force, to keep our streets and neighborhoods safe so that we can walk and live freely and safely.

The framers of the constitutions, recognizing the dangers of criminal conduct and attempting to stop it, could have allowed stops and searches of all citizens looking or acting in a manner other than the manner in which the state believed we should act. Our constitutions do not allow such state action, however. Rather, the constitutions recognize that all persons and property need protection against the power of the state, even when such protection may result in less efficient law enforcement.

The rights of the accused are not just his or hers; they belong to each of us. The interest in being free from unreasonable governmental intrusion is a collective interest, not just an interest belonging to those we suspect of being criminals. *Hoyer v. State,* 180 Wis. 407, 417, 193 N.W. 89 (1923); *Jokosh v. State,* 181 Wis. 160, 163, 193 N.W. 976 (1923). The purpose underlying the constitutional prohibitions against unreasonable searches and seizures is not, as it is often perceived, to protect criminals but to minimize governmental intrusion into the everyday lives of ordinary citizens. To the extent that this court allows encroachment of the constitutional rights of the accused, it allows encroachment on the rights of all. We need to strengthen law enforcement

tools to combat crime, but we cannot justify police practices that would otherwise fail to meet constitutional standards.

By this case, the majority permits a significant intrusion upon our ability to walk freely in our own neighborhoods. The fourth amendment allows stops and searches if there is probable cause to believe the conduct violates the criminal law or if the stop and search fits with the exception to the requirement of probable cause established by the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1 (1968). The *Terry* exception is "narrow," and the Supreme Court has been careful to maintain its limited boundaries despite encouragements to broaden it. *Ybarra v. Illinois,* 444 U.S. 85, 93–94 (1979). *See Florida v. Royer,* —— U.S. ——, 51 L.W. 4293, 4295 (March 23, 1983).

The majority concludes that this stop and frisk falls within *Terry's* narrow exception because the officer was "able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant" the intrusion and that the state proved that the officer's stop and frisk of the citizen was reasonable, judged by an objective standard. *Terry v. Ohio, supra,* 392 U.S. at 21.

The police were in the neighborhood giving a traffic ticket, not investigating a reported crime. Indeed, no crime or suspected crime had been reported. Two men were out walking at 2 a.m. in a residential neighborhood where, as it turned out, the defendant resided. The police officer justifies stopping the defendant because the defendant "stared at" and "monitored" for about twenty seconds a parked police car whose red light was flashing. The defendant's companion admitted to having been convicted of the crime of carrying a gun and to being then "wanted," and when the officer got out of the police car, the defendant turned and started walking away.

It cannot be deemed "reasonable" to consider the exercise of constitutional rights of walking on the street at 2 a.m., watching a police car, walking away from a police car, or being in the company of a convict or even a wanted person sufficiently "suspicious" to justify a stop and frisk.

Reliance on the defendant's actions in walking away as grounds for the stop is especially ironic in the context of this case. The police stopped both the defendant and his companion: the defendant for walking away, the companion for not walking away. If a person may decline to listen to police questions and has the right to "go on his [or her] way," *Florida v. Royer*, —— U.S. ——, 51 L.W. 4293, 4295 (March 23, 1983), I fail to see how exercising that right constitutes reasonable suspicion to stop. As I read this record of justification, there is no way that either the defendant or his companion could have avoided being stopped by the police. If the stop in this case is deemed reasonable then the state, as this case illustrates, literally gets the citizen coming and going.

Guilt by association also fails to provide a sufficient objective standard to allow a stop and frisk. The defendant's companion freely admitted having been convicted of the crime of carrying a gun and that he was "wanted." There is nothing in the record to show that the companion was then carrying a gun. The defendant's "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search" him, *Ybarra v. Illinois,* 444 U.S. 85, 91 (1979), nor does it give rise to even a reasonable suspicion sufficient to stop or frisk him. *Id.* at 94; *Sibron v. New York,* 392 U.S. 40, 62 (1968).

In my opinion, not one of the factors set forth by the majority is sufficient in itself to justify the stop. Neither is the totality of the circumstances. The police officer, in summarizing the totality of the circumstances,

stated that he stopped the defendant because the defendant was in the company of someone who was wanted for carrying a weapon; that the defendant's actions, in turning and walking away from the police, showed that the defendant might have a weapon; that it was dark and he was too far away to see the defendant's hands. Although the police officer subjectively may have believed that the defendant was armed and dangerous and should be stopped, his subjective viewpoint does not withstand objective scrutiny (which, as the majority acknowledges, is required in this case). From an objective point of view the defendant's actions were no more or less than the actions of an ordinary citizen who, walking on a street late at night, became curious about the police presence and then exercised the constitutional right to walk away from the scene. The actions are "so universal in character that one can only speculate as to [their] motivating source." *People v. Thomas,* —— Colo. ——, 660 P.2d 1272, 1275 (1983).

The Colorado Supreme Court recently considered a situation with, according to the majority's logic, even more "indicia of suspicion" and concluded that a person's actions in making eye contact with the police and then leaving the scene were insufficient to justify the temporary detention of the person. As the Colorado court stated, from the officer's viewpoint, "an innocent move may often be mistaken for a guilty reaction. From the perspective of the person observed, the 'furtive gesture' might be impelled by a variety of motives, from an unsettling feeling of being watched to an avoidance of what might be perceived as a form of harassment. *See People v. Superior Court of Yolo County,* 3 Cal.3d 807, 478 P.2d 449, 91 Cal. Rptr. 729 (1970). Then again, a person's movement may not be a reaction to the police

at all." *People v. Thomas*, —— Colo. ——, 660 P.2d 1272 (1983).

*See also United States v. Best*, 563 F. Supp. 1075, 33 Cr. L. 2216 (USDC DC, April 21, 1983), holding unconstitutional as a violation of the *Terry* standards for a stop, a routine police sweep of a parking lot located in an area with a high incidence of drug traffic. The court held that a "mere investigative stop of the type discussed in Terry cannot be justified simply because a person is found in an area with a high incidence of drug traffic, looks unfamiliar and suspicious to the police officer, but has done nothing to create suspicion of 'any specific misconduct,' *Brown v. Texas*. The police must have, in Judge Leventhal's words, a 'founded suspicion of wrongdoing,' *U.S. v. Montgomery*, 561 F.2d 875, 880 (D.C. Cir. 1977)." *Id.* at 1080, 33 Cr. L. at 2217. The action of the police, taking "legal shortcuts in dealing with drug trafficking," was not constitutionally permissible. *Id.*

One might try to justify the officer's actions in this case in hindsight, since the officer's stop and frisk actually produced a gun and the defendant was charged with carrying a concealed weapon. But hindsight is not and can not be the test. If hindsight is the test, the ordinary citizen engaging in ordinary activity is not protected from stops and searches.

I recognize that the police officers in this case may have felt they were just trying to do their job. Police are trained to be suspicious of all persons: Any citizen can be a potential threat to a police officer. But the constitutions protect us against the state's detaining everyone the police officers think may be threatening. In our society a police officer is not "entitled to seize and search every person whom he sees on the street or of whom he makes inquiries." *Sibron v. New York*, 392 U.S. 40, 64 (1968). Police officers may not in our so-

ciety stop a person because officers generally fear for their personal safety and are on guard against all citizens. Police officers may not stop a citizen as a precautionary measure unless reasonable grounds exist to suspect criminal activity.

Like the majority, I am not insensitive to the needs of law enforcement officers. I am aware that the weighty social objective of crime prevention and police protection might well be served by allowing officers to stop, question, and search any person the officers mistrust. As weighty as the concern is to combat the problem of crime in this state and nation, and as concerned as we all are that we each be safe on our streets, this concern can not justify state action that will undermine our constitutional guarantees of freedom. We have not reached the point in our society where citizens walking in their neighborhoods at night should expect to be stopped and frisked by the police.

It is well to remember Benjamin Franklin's words: "They that can give up essential liberty to obtain a little temporary safety deserve neither liberty nor safety."

I dissent. I am authorized to state that CHIEF JUSTICE BRUCE BEILFUSS and JUSTICE NATHAN S. HEFFERNAN join in this dissent.