STATE of Wisconsin, Plaintiff-Respondent,

v.

Tamara Concha LIMON, Defendant-Appellant.†

Court of Appeals

*No. 2007AP1578–CR. Submitted on briefs January 31, 2008.*
*—Decided April 8, 2008.*

2008 WI App 77

(Also reported in 751 N.W.2d 877.)

† Petition to review denied 7/28/08.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *William J. Tyroler*, assistant state public defender, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J. B. Van Hollen*, attorney general, and *James M. Freimuth*, assistant attorney general.

Before Curley, P.J., Wedemeyer and Fine, JJ.

¶ 1. CURLEY, P.J. Tamara Concha Limon appeals from a judgment of conviction entered after she pled guilty to one count of possession with intent to deliver cocaine as party to a crime, contrary to WIS. STAT. §§ 961.16(2)(b)1., 961.41(1m)(cm)1r., and 939.05 (2003–04).[1] Limon pled guilty after the trial court denied her motion to suppress evidence discovered during a search of her purse.[2]

¶ 2. In challenging the trial court's denial of her suppression motion, Limon argues that the investigative stop and subsequent search of her purse violated her constitutional rights.[3] We disagree and conclude

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[2] A defendant may appeal from an order denying a motion to suppress evidence even though the judgment of conviction rests on a guilty plea. WIS. STAT. § 971.31(10) (2005–06).

[3] Limon devotes substantial space in her brief to an argument titled, "The seizure of Ms. Limon was not supported by reasonable suspicion." The issue of her seizure is not relevant to our analysis of whether the search of her purse was warranted and whether it complied with *Terry v. Ohio*, 392 U.S. 1 (1968),

that the totality of the circumstances provided sufficient justification for an investigative stop; that the police officer who searched Limon's purse "reasonably suspect[ed] that he . . . or another [wa]s in danger of physical injury," WIS. STAT. § 968.25; and that the search was a valid weapons frisk. Accordingly, we approve the trial court's decision to deny Limon's suppression motion and affirm the judgment of conviction.

## I. BACKGROUND.

¶ 3. The relevant facts as developed at the suppression hearing are not in dispute. During the week of April 21, 2006, a Milwaukee police officer received information regarding a residence located at 5178 North 39th Street in Milwaukee from a citizen who wished to remain anonymous. According to the officer, the citizen told him:

> [There was] a lot of loitering that was going on at this residence, that there was drug dealing going on, people smoking drugs and that he was very fearful for his safety because of it[,] because he's in the area quite a bit; and he asked me if I could monitor that residence.

The citizen also told the officer that he had spoken to the owner of the residence, who indicated that the lower unit was vacant and that no one should be on the porch there.

¶ 4. The officer was questioned at the suppression hearing about the citizen who reported the information to him. The officer testified that the citizen who ap-

WIS. STAT. §§ 968.24, and 968.25. Despite the heading, we read the argument section that follows it to center on whether reasonable suspicion existed to support the investigative stop preceding the search of her purse, the appropriate inquiry under these circumstances.

proached him was not someone he knew or had met before. According to the officer, the citizen "seemed very credible. He wasn't intoxicated. He wasn't high. He was very articulate in what he was telling me, and I had no reason to doubt what he was telling me was true."

¶ 5. Although he never contacted the owner of the residence to verify its vacancy, in the week following the citizen's request, the officer monitored the residence. In addition, he had his sister squad monitor the residence. Occasionally during the week, the officer saw people on the porch of the residence, but he did not have an opportunity to investigate. That changed on April 21, 2006, when, at approximately 2:20 p.m., he and his partner saw two men and Limon on the porch.

¶ 6. After parking the squad car in front of the residence, the officer asked whether either the men or Limon lived at the residence and learned that they did not. It does not appear from the record that any of the three offered an explanation or a purpose for his or her presence at the residence. The officer then asked one of the men to stand up, at which point the officer observed a "blunt" cigar that appeared to contain marijuana on the porch within a foot or so of where the man had been sitting and within approximately three feet of where Limon was standing.[4] The blunt was not lit at the time, and the officer testified that he did not detect the odor of marijuana. Although he did not know how long the blunt had been on the porch, the officer, who had encountered marijuana thousands of times, testified that "[i]t looked fresh."

---

[4] "A 'blunt' is a hollowed-out cigar filled with marijuana." *State v. Vorburger*, 2002 WI 105, ¶ 22 n.8, 255 Wis. 2d 537, 648 N.W.2d 829.

¶ 7. Thereafter, the officer conducted a pat-down search of the man closest to the blunt to check for weapons. The officer testified that the area where the residence was located was considered a high-crime area, and that two blocks away, a state agent was murdered while on duty. He further testified to investigating shootings in the area, that armed robberies were prevalent, and that it seemed like many people in the area were armed. He said that he conducted the pat-down search of the man out of concern for his safety, his partner's safety, and the safety of citizens in the area. Not finding any weapons on the man, the officer then focused on Limon, who remained standing on the porch. Meanwhile, the officer's partner searched and interviewed the other man who was present on the porch.

¶ 8. Limon was cooperative and did not make any furtive movements. Both because the officer did not believe she had a weapon on her person, and due to police department policy, which required that a female officer search a female absent exigent circumstances, he did not conduct a pat-down search of Limon. Limon was, however, holding a purse, and the officer said, "Let me see your purse." Limon handed her purse to the officer, and he opened it and looked inside.

¶ 9. The officer testified that he was looking for weapons that could have been concealed within the purse, which was approximately twelve inches long and six inches high. Upon opening the purse, the officer saw that sitting on top of the contents was a plastic bag, and inside the plastic bag was another clear plastic bag containing a number of individually wrapped white pieces of a chunky substance. Based on his experience, the officer testified that the substance looked like crack cocaine. He subsequently arrested Limon.

¶ 10. Limon was charged with one count of possession with intent to deliver cocaine as party to a crime, contrary to Wis. Stat. §§ 961.16(2)(b)1., 961.41(1m)(cm)1r., and 939.05. She filed a motion to suppress the evidence derived from the search of her purse, which the trial court denied. She pled guilty and now appeals.

## II. Analysis.

■

¶ 11. Limon asks this court to determine whether the investigative stop and subsequent search of her purse violated her constitutional rights. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" is protected by both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution. U.S. Const. amend. IV; Wis. Const. art. I, § 11.[5] "The ultimate standard under the Fourth Amendment is the reasonableness of the search or seizure in light of the facts and circumstances of the case." *Bies v. State*, 76 Wis. 2d 457, 468, 251 N.W.2d 461 (1977).

■

¶ 12. On appeal following the denial of a motion to suppress, we "will uphold the court's findings of fact unless they are against the great weight and clear preponderance of the evidence. However, this court will independently examine those facts to determine

[5] In interpreting this state's constitutional search and seizure provision, we traditionally do so consistent with the United States Supreme Court's interpretation of the Fourth Amendment. *State v. Matejka*, 2001 WI 5, ¶ 17 n.2, 241 Wis. 2d 52, 621 N.W.2d 891.

whether the constitutional requirements of reasonableness [are] satisfied." *State v. Williamson*, 113 Wis. 2d 389, 401, 335 N.W.2d 814 (1983) (citation omitted).

## A. Investigative stop.

¶ 13. Investigative stops were recognized as an effective way for police officers to carry out their tasks of "crime prevention and protection," when the court in *Terry v. Ohio*, 392 U.S. 1 (1968), acknowledged: " '[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' " *State v. Richardson*, 156 Wis. 2d 128, 138, 456 N.W.2d 830 (1990) (quoting *Terry*, 392 U.S. at 22). Wisconsin's " 'statutory expression' " of the constitutional requirements set forth in *Terry* is found at Wis. Stat. §§ 968.24 and 968.25. *Williamson*, 113 Wis. 2d at 400 (citations omitted). These statutes read as follows:

> **968.24 Temporary questioning without arrest.** After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

> **968.25 Search during temporary questioning.** When a law enforcement officer has stopped a person for temporary questioning pursuant to s. 968.24 and reasonably suspects that he or she or another is in danger of physical injury, the law enforcement officer

186

may search such person for weapons or any instrument or article or substance readily capable of causing physical injury and of a sort not ordinarily carried in public places by law abiding persons. If the law enforcement officer finds such a weapon or instrument, or any other property possession of which the law enforcement officer reasonably believes may constitute the commission of a crime, or which may constitute a threat to his or her safety, the law enforcement officer may take it and keep it until the completion of the questioning, at which time the law enforcement officer shall either return it, if lawfully possessed, or arrest the person so questioned.

¶ 14. In order for an investigative stop to be warranted, it is required that "a law enforcement officer reasonably suspect, in light of his or her experience, that some kind of criminal activity has taken or is taking place." *Richardson*, 156 Wis. 2d at 139. "In determining whether the police have lawfully conducted a *Terry* stop, we consider the totality of the circumstances." *State v. Williams*, 2001 WI 21, ¶ 22, 241 Wis. 2d 631, 623 N.W.2d 106.

¶ 15. To support its determination that there was reasonable suspicion for the officers to conduct an investigative stop at the residence, the trial court made a number of factual findings. According to the trial court, one of the officers was informed, in person, by an anonymous citizen, whose demeanor the officer found to indicate reliability, that drug loitering was taking place at the residence. The citizen claimed to have spoken with the owner of the residence to verify that no one should have been there because the residence was vacant. Upon seeing the two men and Limon at the residence, the trial court found that the officers inquired whether any of the three lived at the residence

and learned that no one did. The trial court noted the testimony that the residence was located in a high-crime area.

¶ 16. These findings are not "against the great weight and clear preponderance of the evidence." *Williamson*, 113 Wis. 2d at 401 (citation omitted). Therefore, we must determine independently whether reasonable suspicion existed to support the stop. *See Williams*, 241 Wis. 2d 631, ¶ 18. This determination is contingent upon the extent of information known by the police and the information's reliability. *Id.*, ¶ 22.

¶ 17. The investigative stop stemmed from an anonymous citizen's tip of drug use and loitering on the porch of the residence. "Under appropriate circumstances, an informant's tip can provide a law enforcement officer with reasonable suspicion to effectuate a *Terry* stop. However, before acting on an informant's tip, the police must consider its reliability and content." *State v. Patton*, 2006 WI App 235, ¶ 10, 297 Wis. 2d 415, 724 N.W.2d 347 (citations omitted). Where an anonymous tipster is involved, police are required to conduct an independent investigation to corroborate the information provided.[6] *Id.*

---

[6] Limon argues that her attorney was precluded from exploring the issue of the citizen's reliability when the trial court sustained the State's objection to her attorney's questioning in this regard. In addition, in an effort to determine if the information was corroborated, Limon's attorney asked the officer if the sister squad had relayed information to him regarding whether it had observed individuals on the porch of the residence. The State objected as to relevancy, and the trial

> The degree of necessary corroboration will vary with the particular case. The less reliable the tip, the more the necessity for additional information to establish reasonable suspicion. Tips from anonymous informants may be reliable if the tip contains "inside information or

court sustained this objection as well. As a result, Limon contends that "[h]aving thwarted defense efforts to show that the information wasn't corroborated the State now argues that there was indeed sufficient corroboration," which she contends amounts to classic judicial estoppel and bars us from addressing this argument. *See State v. English-Lancaster*, 2002 WI App 74, ¶ 18, 252 Wis. 2d 388, 642 N.W.2d 627 ("Judicial estoppel is an equitable rule applied at the discretion of the court to prevent a party from adopting inconsistent positions in legal proceedings."). We disagree.

Judicial estoppel is not necessary here. Although the record reveals that at one point during cross-examination of the officer the trial court limited questioning regarding the anonymous tipster's reliability, the record further reveals that Limon's attorney was otherwise able to explore the issue. The officer testified at the suppression hearing that he had not previously met the citizen providing the tip, nor had the citizen ever provided him with any other information in the past. The officer also testified regarding his assessment of the citizen's credibility.

While the trial court should have overruled the State's objection that "[the citizen's] reliability is not relevant to this particular hearing," the record nevertheless shows that Limon's attorney had ample opportunity to question the officer on this issue. Moreover, following the State's objections, Limon's attorney did not offer any explanation as to why her questions pertaining to the officer's assessment of the citizen's reliability and the sister squad's observations were material. "Where no offer of proof was made with regard to any testimony excluded by the ruling, and where no explanation was given as to why defense counsel thought the question was material, no [erroneous exercise] of discretion can be found." *Haskins v. State*, 97 Wis. 2d 408, 422–23, 294 N.W.2d 25 (1980).

a similar verifiable explanation of how the informant came to know of the information in the tip, which the police in turn independently corroborate."

*Id.* (citation omitted).

██

¶ 18. Here, the tipster presented himself to the officer, thus allowing the officer an opportunity to personally assess the tipster, which led him to conclude that the tipster "seemed very credible. He wasn't intoxicated. He wasn't high. He was very articulate in what he was telling me, and I had no reason to doubt what he was telling me was true." Moreover, the tipster jeopardized his anonymity and risked arrest if the tip proved to be false by approaching the officer in person, as opposed to making an anonymous telephone call, and by further telling the officer that he was frequently in the area where the residence was located. *See State v. Rutzinski,* 2001 WI 22, ¶ 32 & n.8, 241 Wis. 2d 729, 623 N.W.2d 516. "Risking one's identification intimates that, more likely than not, the informant is a genuinely concerned citizen as opposed to a fallacious prankster." *Williams,* 241 Wis. 2d 631, ¶ 35; *see also United States v. Heard,* 367 F.3d 1275, 1279 (11th Cir. 2004) (face-to-face anonymous tip presumed to be inherently more reliable than anonymous telephone tip).

██

¶ 19. Support for an anonymous tip can also be found via "police corroboration of innocent, although significant, details of the tip." *Williams,* 241 Wis. 2d 631, ¶ 39. The officers corroborated that neither Limon nor the two men resided at the residence. If any of the three had permission to be at the residence, it is reasonable to infer that such information would have

been offered to the police officers. Yet, there is no indication in the record that any explanation was provided.

¶ 20. Upon telling one of the men to stand up and subsequently noting the presence of a fresh-looking marijuana blunt, the officers had reason to suspect a violation of the criminal statutes prohibiting possession of marijuana, as well as Milwaukee's ordinance specifically pertaining to drug loitering, MILWAUKEE, WIS., ORDINANCE § 106–35.6.2. The drug loitering ordinance provides:

> Any person who loiters or drives in any public place in a manner and under circumstances manifesting the purpose of inducing, enticing, soliciting or procuring another to engage in illegal drug activity shall forfeit not less than $500 nor more than $5,000 or upon default of payment be imprisoned for not more than 90 days . . . . The violator's conduct must be such as to demonstrate a specific intent to induce, entice, solicit or procure another to engage in illegal drug activity. No arrest may be made for a violation of this section unless the arresting officer first affords the person an opportunity to explain the person's presence and conduct . . . .

*Id.*

¶ 21. Limon argues that, pursuant to ORDINANCE § 106–35.6.2, the officer was required to ask the three individuals to explain their presence. According to her, the officer should have asked what the three were doing on the porch because it may have been that they had just arrived and were looking for the owner of the residence, or perhaps, they went to the wrong address. We do not agree with Limon that the officer was required to make this inquiry. Rather, when the officer asked Limon and the two men whether anyone resided

191

at the residence, he adequately provided the three individuals with "an opportunity to explain [their] presence and conduct," in accordance with the ordinance. *Id.* As previously noted, if an innocent explanation had been available to the three, it is reasonable to infer that it would have been offered at the time.

¶ 22. We do not consider Limon's presence at the residence in isolation, as she seems to request, by arguing that neither the citizen's tip nor her own conduct was suggestive of criminal activity. Instead, we consider the circumstances facing the investigating officers collectively in determining whether reasonable suspicion existed to justify the investigative stop. *See United States v. Arvizu*, 534 U.S. 266, 277–78 (2002) (holding that facts, which by themselves suggested a "family in a minivan on a holiday outing," when viewed collectively with other facts amounted to reasonable suspicion). "Suspicious activity justifying an investigative stop is, by its very nature, ambiguous. Unlawful behavior may be present or it may not. The behavior may be innocent. Still, officers have the right to temporarily freeze the situation so as to investigate further." *State v. Krier*, 165 Wis. 2d 673, 678, 478 N.W.2d 63 (Ct. App. 1991) (citations omitted).

¶ 23. Although she recognizes that "[t]he blunt, of course, was contraband—itself evidence of criminal activity," Limon argues that the police lacked reasonable suspicion to attribute possession of the blunt to her. She contends that the State failed to address her argument in this regard and accordingly, conceded the issue. The State, however, was not required to prove that Limon had possession of the marijuana in order to establish that the officers reasonably suspected that she was committing, was about to commit, or had commit-

ted a crime. *See* WIS. STAT. § 968.24. All that was necessary to justify the officers' investigative stop was a " 'reasonable inference of wrongful conduct.' " *State v. Griffin*, 183 Wis. 2d 327, 333, 515 N.W.2d 535 (Ct. App. 1994) (citation omitted). The potential availability of an innocent explanation does not prohibit an investigative stop:

> [P]olice officers are not required to rule out the possibility of innocent behavior before initiating a brief stop . . . . [I]f any reasonable inference of wrongful conduct can be objectively discerned, notwithstanding the existence of other innocent inferences that could be drawn, the officers have the right to temporarily detain the individual for the purpose of inquiry.

*Id.* (citation omitted; alterations in *Griffin*). Similarly, it is of no consequence that loitering citations were never issued to Limon and the men. *See State v. Amos*, 220 Wis. 2d 793, 801, 584 N.W.2d 170 (Ct. App. 1998) (holding that the ultimate merits of the trespassing ordinance issue, which factored into the officers' calculation of reasonable suspicion, were irrelevant to whether the officers had the requisite suspicion of illegal activity to justify the stop).

¶ 24. Finally, in arguing that police officers lacked reasonable suspicion to commence a *Terry* stop, Limon analogizes the circumstances of her case to those present in *State v. Washington*, 2005 WI App 123, 284 Wis. 2d 456, 700 N.W.2d 305. *Washington*, however, is distinguishable. In *Washington*, police officers were sent to investigate a complaint that loitering and drug sales were taking place at an allegedly vacant house, and upon arriving at the house, Washington, whom the police recognized from previous encounters, was in front of it. *Id.*, ¶ 2. The police ordered him to stop, and although he initially did so, he proceeded to step back-

wards looking nervous. *Id.* It was at that point that Washington threw his hands up, dropping a towel. *Id.* After subduing Washington and retrieving the towel, the officers found a baggie containing cocaine was wrapped inside. *Id.* Washington was subsequently charged with possession of cocaine. *Id.* In concluding that the requisite reasonable suspicion was lacking at the time the police initially ordered Washington to stop, we held:

> Investigating a vague complaint of loitering and observing Washington in the area near a house that the officer believed to be vacant, even taken in combination with the officer's past experiences with Washington and his knowledge of the area, does not supply the requisite reasonable suspicion for a valid investigatory stop. People, even convicted felons, have a right to walk down the street without being subjected to unjustified police stops.

*Id.*, ¶ 17.

¶ 25. In contrast to the vague complaint of loitering in *Washington*, here, one of the officers conducting the investigative stop involving Limon had in-person contact with the citizen who provided the tip that drug dealing and drug use were occurring at the residence. In addition, Limon was not found walking down the street in front of the residence, as it appears Washington was; instead, Limon was on the porch of the residence in the presence of contraband. Furthermore, the officers inquired whether Limon resided at the residence and gave her an opportunity to explain the reason she was there, unlike in *Washington*, where it does not appear that the officers made such inquiry. Finally, that drugs were visibly present on the porch near Limon distinguishes this case from the situation in *Washington*, where drugs were not discovered until after Washing-

ton was subdued and the police had an opportunity to look inside the towel he dropped.

¶ 26. Based on the totality of the circumstances, we conclude that the officers' suspicion that some kind of criminal activity had taken or was taking place on the porch at the residence was reasonable so as to justify the investigative stop. *See Richardson*, 156 Wis. 2d at 139.

*B. Search of Limon's purse.*

¶ 27. Even though the officers' investigative stop was justified, it does not necessarily follow that the search of her purse was reasonable. *Williamson*, 113 Wis. 2d at 403. The standard we employ in determining whether a search was warranted is set forth in *Terry*, where the United States Supreme Court held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.*, 392 U.S. at 30. *Terry*'s holding is restated in Wis. Stat. § 968.25, which provides that once an investigative stop has been made, a protective search for weap-

195

ons can ensue if the officer "reasonably suspects that he or she or another is in danger of physical injury."

¶ 28. We rely on an objective standard in our review of the facts and circumstances of this case: "would the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22 (citations omitted). For the search to be upheld, the officer was required "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21; *see also State v. McGill*, 2000 WI 38, ¶ 24, 234 Wis. 2d 560, 609 N.W.2d 795 (noting that the "articulable" requirement "does not amount to a requirement that the court restrict its reasonableness analysis to the factors the officer testifies to having subjectively weighed in his ultimate decision to conduct the frisk"). "We may look to any fact in the record, as long as it was known to the officer at the time he conducted the frisk and is otherwise supported by his testimony at the suppression hearing." *McGill*, 234 Wis. 2d 560, ¶ 24.

¶ 29. The trial court's relevant findings in this regard were as follows: "it was a high[-]crime area, [the officers] notice[d] something which they believe[d] to be drugs on the porch, and had experienced a number of shootings in that area or were aware of the number of shootings in that area."[7] The court noted that the

---

[7] Limon argues that the record is ambiguous on the question of shootings due to the fact that the officer's testimony was only that he had investigated shootings in the area, without detailing how many. Regardless of the number of shootings, the trial court's finding that the residence was in a high-crime area

request for Limon's purse, which could have contained a gun, happened quickly, and that the officers were concerned for their safety as they did not have backup at the scene.

¶ 30. These facts are supported by the record. *See Williamson*, 113 Wis. 2d at 401. Therefore, we independently review the facts to determine whether there was a reasonable suspicion to justify the protective search of Limon's purse. *See Williams*, 241 Wis. 2d 631, ¶ 18. In doing so, we are mindful of Wisconsin's rejection "of a per se rule that suspicion of drug dealing of itself would constitute circumstances justifying a protective search." *State v. Johnson*, 2007 WI 32, ¶ 29 n.10, 299 Wis. 2d 675, 729 N.W.2d 182 (citing *Williams*, 241 Wis. 2d 631, ¶ 53). We also are aware, however, that courts have noted "the link between dangerous weapons and the drug trade." *Id.*, ¶ 29.

¶ 31. In an effort to prove that the search of her purse was invalid under *Terry*, Limon argues that it was based on little more than a hunch, and directs us to the officer's testimony that he did not believe she had a weapon on her person, but that he searched her purse because there was a chance it contained a gun. *See Id.*, 392 U.S. at 22 (cautioning that it would not sanction "intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches"). Limon's emphasis on the officer's testimony that there was a chance the purse contained a gun is misplaced.

---

is supported by the record, given the officer's testimony that a state agent was murdered in the area while on duty, that armed robberies were prevalent, and that it seemed like many people in the area were armed.

¶ 32. The officer's testimony was that exigent circumstances were not present so as to authorize a pat-down search of Limon's person, but that the size and nature of the purse led him to believe it would have been a convenient place to keep a gun. Believing that the purse *may* have contained a weapon was sufficient to justify the search when considered in conjunction with the other factors presented to the officer. *See id.* at 27 (noting that absolute certainty that an individual is armed is not required); *State v. Morgan*, 197 Wis. 2d 200, 209, 539 N.W.2d 887 (1995) ("hold[ing] that an officer making a *Terry* stop need not reasonably believe that an individual *is* armed; rather, the test is whether the officer 'has a reasonable suspicion that a suspect *may be* armed' " (citation omitted; emphasis added)).

¶ 33. Limon argues that the "[r]ecord does not support individualized suspicion to believe that [she] was armed and dangerous: at most she possessed a small amount of marijuana in a high-crime area but without displaying conduct evincing dangerousness." This argument minimizes the other circumstances surrounding the investigative stop at the residence. " 'It is not simply the nature of the suspected offense but all of the circumstances under which the confrontation takes place that must be taken into consideration in determining whether an officer is entitled to conduct a limited weapons search of a person whom he has justifiably stopped.' " *State v. Allen*, 226 Wis. 2d 66, 76–77, 593 N.W.2d 504 (Ct. App. 1999) (citation omitted); *cf. State v. Mata*, 230 Wis. 2d 567, 574–75, 602 N.W.2d 158 (Ct. App. 1999) (where, after conducting a routine traffic stop, the investigating officer detected odor of marijuana and subsequently searched a person

198

who was a passenger in vehicle, the court concluded that the officer's actions and suspicions were reasonable given the odor of marijuana and the fact that the vehicle was in high-crime area, known for its gang, drug, and weapons activity).

¶ 34. Here, the officers were outnumbered and without backup when, following an anonymous tip that drug dealing and drug loitering activities were taking place on the porch of a residence in a high-crime area, they approached Limon and two men. The officers learned that the three did not live at the residence, and it appears that no explanation as to their presence was forthcoming. Shortly thereafter, a smokeable form of marijuana was observed on the porch. Under these circumstances, we conclude that the protective search of Limon's purse was warranted based on the officers' reasonable suspicion that they were in danger of physical injury. *See* Wis. Stat. § 968.25. The absence of backup at the scene and the fact that Limon's arrest occurred shortly after the police made their investigative stop— within approximately one minute based on testimony at the suppression hearing—support this conclusion. *Cf. State v. Mohr*, 2000 WI App 111, ¶¶ 15–16, 235 Wis. 2d 220, 613 N.W.2d 186 (concluding that frisk was unreasonable where it occurred twenty-five minutes after the initial traffic stop and backup was present, because it was done as a general precautionary measure rather than because the officer thought the defendant was dangerous).

¶ 35. We conclude that the search of Limon's purse was reasonable under these circumstances. *See Bies*, 76 Wis. 2d at 468.

## C. *Compliance with Terry.*

██

¶ 36. In her final argument, Limon argues that when the officer opened her purse, the search exceeded the scope of a valid weapons frisk under *Terry*. Although *Terry* provides only for an officer "to conduct a carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault him," *id.*, 392 U.S. at 30, we hold that under these circumstances the search was properly broadened to encompass the opening of Limon's purse. Here, again, we agree with the trial court that Limon's purse was essentially an extension of her person where the purse was accessible by her, and because the officers were concerned for their safety, "they should be able to protect themselves to the extent that if they are concerned, they should be able to find if there are weapons on the person or close enough to the person where that person can cause harm to the officer." *See generally Michigan v. Long*, 463 U.S. 1032, 1034–35, 1047 (1983) (expanding *Terry* protective search for weapons to encompass area beyond the person so as to justify search of passenger compartment of vehicle and further noting that "*Terry* need not be read as restricting the preventative search to the person of the detained suspect").

¶ 37. Limon disagrees and suggests that the officers should have patted down her purse as opposed to "diving into it." The record is silent, however, regarding whether Limon's purse was cloth, leather, vinyl, or some other material, making it unclear whether a pat-down would have been worthwhile.

¶ 38. This court has held that under certain circumstances a *Terry* search may entail more than an external pat-down:

> an officer is entitled not just to a pat[-]down but to an *effective* pat[-]down in which he or she can reasonably ascertain whether the subject of the pat[-]down has a weapon; where an effective pat[-]down is not possible, the officer may take other action reasonably necessary to discover a weapon.

*State v. Triplett*, 2005 WI App 255, ¶ 12, 288 Wis. 2d 515, 707 N.W.2d 881 (emphasis in *Triplett*). Here, not being able to conduct a pat-down search of Limon's person due to police department policy, and without any evidence in the record that a pat-down of Limon's purse would have been effective, it was reasonable for the officer to open Limon's purse in order to protect himself and others. *See generally Terry*, 392 U.S. at 28 (noting that "the record evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so").

¶ 39. Furthermore, we are not persuaded by Limon's argument related to the "intensely private nature of a purse," which she contends entitles it to "very strong protection against intrusions." Given our conclusion that the officer had reasonable suspicion to believe "that he . . . or another [wa]s in danger of physical injury," as required by WIS. STAT. § 968.25, we are not convinced that the protection of Limon's privacy interests in her purse trump the officer's safety concerns under these circumstances.

¶ 40. According to Limon, the officer effectively protected himself by taking possession of her purse, so as to make his subsequent act of opening the purse unreasonable.[8] We disagree, and instead adopt the trial

---

[8] Limon cites the recently decided case of *In re Tiffany O.*, 174 P.3d 282 (Ariz. Ct. App. 2007), which rejected the search of

court's reasoning that even if the officer temporarily had taken away Limon's purse, at some point he would have had to return it to Limon, again jeopardizing his safety. "Police officers are not required to take unnecessary risks in the performance of their increasingly hazardous duties." *State v. Beaty*, 57 Wis. 2d 531, 539, 205 N.W.2d 11 (1973); *see generally United States v. Flippin*, 924 F.2d 163, 166–67 (9th Cir. 1991) (upholding search of make-up bag where "[m]erely gaining control of the bag did not dissipate the danger and exigent circumstances"); *cf. State v. Clevidence*, 736 P.2d 379, 384 (Ariz. Ct. App. 1987) (not unreasonable to search wallet even though it was out of suspect's reach). We conclude that the search of Limon's purse was entirely proper under *Terry* and Wis. Stat. § 968.25.

¶ 41. Because the investigative stop and search of Limon's purse were valid, the denial of Limon's suppression motion was proper. Accordingly, we affirm.

*By the Court.*—Judgment affirmed.

■■■■■■

a purse relying on the rationale set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). Aside from the fact that *Tiffany O.* is not binding authority on this court, its facts are distinguishable. *Tiffany O.* arose out of a 9-1-1 call that a juvenile female was suicidal. *Id.*, 174 P.3d at 284. Upon arriving at the scene, an officer immediately seized and opened the juvenile's purse, which contained drug paraphernalia. *Id.*

"There is no set standard for what constitutes a reasonable police reaction in all situations. Rather, the reasonableness of the reaction depends upon the circumstances facing the officer." *State v. Williamson*, 113 Wis. 2d 389, 402, 335 N.W.2d 814 (1983). In Limon's case, the circumstances facing the officer who searched her purse were in stark contrast to the circumstances presented in *Tiffany O.* As a result, we conclude that *Tiffany O.* is inapposite.