STATE of Wisconsin, Plaintiff-Respondent,

v.

Cordarol M. KIRBY, Defendant-Appellant.

Court of Appeals

*No. 2013AP896–CR. Submitted on briefs January 30, 2014.
—Decided June 11, 2014.*

2014 WI App 74

(Also reported in 851 N.W.2d 796.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrew R. Walter* of *Walter Law Offices, LLC* of Elkhorn.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *Nancy A. Noet*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Neubauer, P.J., and Gundrum, J.

¶ 1. BROWN, C.J. Cordarol Kirby appeals his conviction for possessing a sawed-off shotgun, arguing that the evidence of it should be suppressed because a police officer entered the premises containing the shotgun without a warrant, without consent, and without exi-

gent circumstances to enter. We hold that whether the officer was over the threshold a few steps does not matter. This is because the officers were lawfully present at the scene when they were apprised that there was a shotgun in a backpack associated with the men who were being questioned, most of whom were still inside the apartment, feet away from the officers. As such, officer safety, an exigent circumstance, gave justification for the officer to locate the backpack in the apartment and, once it was located near the men, seize the shotgun. We affirm.

## Facts

¶ 2. On September 19, 2011, at about 4:10 p.m., a Racine police officer was dispatched to the area of 16th Street and Packard Avenue in response to "a report of a large group fighting." When the officer got to the corner, there was no active fighting, and she drove around the area to see "if anybody would flag me down that needed assistance or had been assaulted." No one did. There were pedestrians walking around outside because it was a busy time of day in the neighborhood.

¶ 3. While the officer was completing this "area check," she received a phone call from an investigator with information from an informant "that the main aggressor in the fight was a black male wearing a black sweatshirt and . . . a black Chicago Bulls baseball hat." This same informant also reported that the aggressor "was threatening to come back to the area with a gun."

¶ 4. At some point around the same time the officer got a second dispatch telling her that the landlord of an apartment building at 1652 Washington Avenue "thought that maybe some of the juveniles that had been fighting had gone into" that building. Another

426

officer joined her at the scene and together they went to speak to the landlord at a nearby building; he reported that he believed the juveniles involved in the fight were in apartment number 1 at 1652 Washington Avenue.

¶ 5. The two officers proceeded to 1652 Washington Avenue, where a female tenant let them in. Inside the building the officers found a man walking down the hallway away from apartment number 1. They stopped the man, who identified himself and said that he was leaving from apartment number 3. When one of the officers pointed out that apartment number 3 was right behind them, where they were currently standing, the man agreed to show them the apartment he actually came from, which turned out to be apartment number 1, not apartment number 3.

¶ 6. The door to apartment number 1 was already "wide open" when they reached it. There were five men inside, one of them standing in the doorway. The officers noticed that one of the men inside was wearing a Chicago Bulls cap. The female officer then called the investigator who had told her that the aggressor in the fight wore a Chicago Bulls cap. It turned out that the particular cap worn by the individual in apartment number 1 matched the informant's description of the aggressor's hat: " 'Chicago' in large letters written across the front and . . . the Chicago bull in the center."

¶ 7. At that point, the officers asked the man wearing the Chicago Bulls cap to step into the hallway for questioning, and he complied. The officers also decided to identify the men in the apartment, in case later someone reported that they were assaulted during the fight earlier that day. The man in the Chicago Bulls cap, Kirby, spoke to one officer in the hallway while the other officer interviewed the rest of the men in the apartment.

427

¶ 8. The officer charged with interviewing Kirby stood in the hallway with him, while the other officer stood in the doorway of the apartment. There were four young men in the apartment, some near the doorway and others farther into the room. During the process of asking the men inside the apartment to identify themselves, the officer "[broke] the threshold of the apartment" so she could hear one of the men in the back of the room. Testimony indicated that three of the men were seated on the furniture in the living room area, while one stood in front of the couch. One of the men, Robert Armstrong, sat on the back of the couch near the doorway; he lived at the apartment with his mother, and he called her on the phone during the interaction with the police. During that conversation, Armstrong's mother asked to speak to the police, and Armstrong passed his phone to the officer who was in the apartment. Neither Armstrong nor his mother ever asked the officers to leave the apartment. In addition to identifying the men, the officers advised the men that there had been a complaint of a fight and that "the main party" had been described as wearing a Chicago Bulls cap and black sweatshirt, which "obviously" matched someone in the apartment.

¶ 9. The officer who was inside the apartment testified at the suppression hearing that she told the men "to knock it off and behave, basically," and was just about to leave, when she received another phone call with more information about the fight. The investigator who called asked whether there was a black backpack in the apartment because an informant said that if there was a black backpack present, it had "a sawed-off shotgun and a handgun" inside. The officer testified that when she received this call about the shotgun, she was standing a few steps inside the apartment. She

could not see the backpack and had to move a couple steps to the right to better see the "family room area." When she looked from that vantage point, she could see a black backpack "in the middle of the love seat."

¶ 10. She testified that when she saw the backpack there, she thought, "there are five people . . . and two police officers," which made her fear that the officers were "vulnerable." She "was concerned [one or more of the men] would either run or . . . try to grab at the backpack and if there was a weapon in there, get the weapon." She "decided that the safest thing to do would be to place everybody in handcuffs until I could check the backpack" for weapons. She was short one pair of handcuffs and therefore let Armstrong continue speaking on the phone to his mother, directing him "not to make any sudden movements."

¶ 11. After cuffing the men and instructing Armstrong to do as told, the officer picked up the backpack and asked if it belonged to anyone. In response "[e]verybody said that it was not their backpack." She asked again, and "[a]gain everybody said the backpack was not theirs." Kirby claimed that the backpack belonged to someone named "Quincey," but neither Kirby nor anyone else had any more details about Quincey: "it was just some guy who dropped the backpack off."

¶ 12. The officer announced her intention to open the backpack, if it belonged to no one there. No one objected. When she opened it, she found a loaded sawed-off shotgun inside. She then called for backup to help transport the men from the scene. Later, going through the backpack more thoroughly, she found a pair of pants inside and a medical card in the pocket with Kirby's name on it. Additionally, one of the other men identified Kirby as the owner of the backpack.

¶ 13. Ultimately, Kirby was prosecuted for possessing the sawed-off shotgun, carrying a concealed weapon, and disorderly conduct with the weapon. He moved to suppress evidence found in the backpack, asserting that the officers violated his reasonable expectation of privacy in the apartment and the backpack. The circuit court denied Kirby's motion, stating that "the officers were never denied entry to the apartment" and "never took affirmative steps to enter" it but merely were continuing an "investigation based on reasonable suspicion." The court also said that in any event the warrant issue "is moot because Kirby not only did not claim [the backpack], but affirmatively disavowed ownership."

¶ 14. Thereafter Kirby pled guilty to possession of the sawed-off shotgun. He challenges the ruling on his suppression motion.

*Analysis*

¶ 15. Kirby makes much of the fact that the officer stepped over the threshold of the apartment during the initial discussion with the men. He claims that he has standing to assert a reasonable expectation of privacy in the apartment because he was a good friend of the host and stayed there often. Thus, he asserts, any search and seizure was unlawful and must be suppressed.

¶ 16. Certainly, the law is clear that unreasonable searches and seizures violate the state and federal constitutions. U.S. CONST. AMEND. IV, WIS. CONST. ART. I, § 11. Whether a guest has a reasonable expectation of privacy while in another's home depends upon how "firmly rooted" the guest's relationship is with the host

430

and with the host's home. *State v. Trecroci*, 2001 WI App 126, ¶ 59, 246 Wis. 2d 261, 630 N.W.2d 555. In *Trecroci*, for instance, a guest had a reasonable expectation of privacy in an attic that was leased by her fiancé and that she had used on past occasions for private activities. *Id.*, ¶¶ 1, 60. The facts in *Trecroci* established the guest's "firmly rooted" relationship with the host and with the attic. *Id.*, ¶¶ 59–61.

¶ 17. For brevity's sake, we assume without deciding that Kirby had a reasonable expectation of privacy in the apartment.[1] We determine that even though the officer was a few steps over the threshold, that fact is completely irrelevant here. It is the law that in certain exigent circumstances, an officer's warrantless intrusion may be justified. The exigent circumstances doctrine justifies a warrantless search or seizure if "a police officer, under the facts as they were known at the time, would reasonably believe that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood

---

[1] On appeal the State argues that Kirby lacked any reasonable expectation of privacy in the apartment. In support, the State cites *State v. Whitrock*, 153 Wis. 2d 707, 452 N.W.2d 156 (Ct. App. 1989), *aff'd*, 161 Wis. 2d 960, 468 N.W.2d 696 (1991). In *Whitrock*, the defendant was a guest of an evicted tenant of the apartment, and the tenant himself was not there at the time of the police encounter. *See Whitrock*, 161 Wis. 2d at 965–67. Here, in contrast, the uncontested testimony indicates that Kirby and Armstrong (who was one of the tenants of the apartment and whose mother spoke to the officers) had known each other since childhood and that at the time of this encounter, Kirby visited Armstrong's apartment approximately three times a week, staying for eight or nine hours at a time. In any case, in the end, our holding is such that this issue does not matter.

of the suspect's escape." *State v. Garrett*, 2001 WI App 240, ¶ 11, 248 Wis. 2d 61, 635 N.W.2d 615 (citation omitted). Officers in the midst of a lawful investigation may conduct a warrantless search or seizure when "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *State v. Limon*, 2008 WI App 77, ¶¶ 28, 33–34, 312 Wis. 2d 174, 751 N.W.2d 877 (citation omitted). Such exigent circumstances arise in a variety of circumstances, including "(1) an arrest made in 'hot pursuit,' (2) a threat to safety of a suspect or others, (3) a risk that evidence will be destroyed, and (4) a likelihood that the suspect will flee." *Garrett*, 248 Wis. 2d 61, ¶ 11 (citation omitted); *see also Kentucky v. King*, 563 U.S. ___, 131 S. Ct. 1849, 1856 (2011).

■

¶ 18. In the case at hand, exigent circumstances that developed during this investigation justified the warrantless search and seizure of the backpack with the sawed-off shotgun in it. This officer was in the midst of completing her interview of several men suspected of involvement in a fight nearby. She was even readying to leave with the admonition to tell the men to "knock it off." Then, she received information that the men possessed a black backpack with weapons in it—a sawed-off shotgun and a handgun.[2] There was already a previous report that the chief aggressor in the fight, who fit Kirby's description, had threatened to return to the scene with a weapon. The officer initially saw no weapon at the scene, but then received a report that these men involved in the fight had a black backpack with a sawed-off shotgun and a handgun in it. Impor-

---

[2] Though the informant's call mentioned both types of weapons, only a sawed-off shotgun was found in the backpack.

tantly, even had the officer been outside the threshold of the apartment instead of having crossed over it, this new information would have created the same exigent circumstances justifying entry into the apartment to see if there was a black backpack near these men like the one described.

¶ 19. Therefore, it is immaterial that, as it so happened, the officer had already stepped into the apartment when the exigent circumstances arose. Whether or not the men's behavior constituted consent to the officer's entry,[3] the fact is that so long as she was standing in the vicinity of this group of men when she received the information that they might possess a backpack with loaded weapons in it, her search for and seizure of the backpack was, at that moment, justified by exigent circumstances. Asking the men to wait while she got a warrant to search for the backpack could have provoked violence. *See Limon*, 312 Wis. 2d 174, ¶¶ 28, 33–34 (permitting search of purse for a weapon based upon exigent circumstances when officers conducting an investigation were "outnumbered and without backup" and reasonably suspected they could be in physical danger from a weapon). The only reasonable course of action was to temporarily handcuff as many of

---

[3] While mere acquiescence is not equivalent to consent, *State v. Johnson*, 177 Wis. 2d 224, 233–34, 501 N.W.2d 876 (Ct. App. 1993), consent can be implied, rather than expressed verbally, via "non-verbal form through gestures and conduct," *State v. Tomlinson*, 2002 WI 91, ¶ 37, 254 Wis. 2d 502, 648 N.W.2d 367. A strong argument can be made that, because the door was open, the men seemed very willing to discuss the matter with police and were freely cooperating, and the man who lived in the apartment asked the officer to speak to his mother who was on the telephone, the officer had at least limited consent to enter a few steps into the apartment so as to be able to hear the men who were giving her their names.

the men as she had handcuffs for and then conduct a limited protective search for a backpack in the vicinity.

¶ 20. The remaining question is whether the officer violated Kirby's reasonable expectation of privacy by seizing and opening the backpack once she saw it close by. Even if one of the men had objected, which did not occur, exigent circumstances justified this intrusion as well. Once she visually confirmed that there was a backpack matching the description of the one that the informant said contained loaded weapons, sitting right next to the men, the officer was justified in checking the backpack. If there were no weapons, the possible danger to safety would be alleviated and the men could be released from their handcuffs with a minimum of intrusion. But for that to happen, the officer had to see if there were dangerous weapons at hand.

██

¶ 21. So, the exigent circumstances continued through the search of the backpack. But, there is a cogent alternative reason justifying the seizure and search of the backpack. Kirby disavowed any connection with the backpack, as did the other men. When asked, Kirby not only disclaimed any ownership interest in it, he claimed that it belonged to the elusive "Quincey." Although property interests are not determinative of privacy rights, disclaiming any right to control an item or any interest in it undermines one's privacy interest in the item. *See State v. Whitrock*, 161 Wis. 2d 960, 977, 468 N.W.2d 696 (1991) (noting that the defendant failed to demonstrate a reasonable expectation of privacy in stolen stereo equipment when he "did not assert dominion or control over [it]" and left it sitting in the residence from which his friend had been evicted). Kirby brought the backpack to an apartment from which he quite arguably had no right to exclude

434

anyone, left it sitting on the love seat while he spoke to the officer in the hall, and disavowed any connection to the backpack when the officer asked whose it was. The circuit court correctly recognized that in these circumstances Kirby had no legitimate expectation of privacy in the backpack.

¶ 22. We have discussed the centerpiece of Kirby's argument—that the officer stepped over the threshold without a warrant—and rejected it on exigent circumstances grounds. This is not to say that the "implied consent to enter" and "no expectation of privacy" approaches lacked merit. But it is an important point to make that, while exigent circumstances may justify entry, the fact that entry has already been made does not necessarily invalidate reliance on the exigent circumstances doctrine.

*By the Court.*—Judgment affirmed.